ARMSTRONG, P.J.
*129 Petitioners appeal a judgment of the circuit court that dismissed their petition for judicial review of a final order of the Oregon Department of State Lands (ODSL) to sell the "East Hakki Ridge parcel," which is part of the Elliot State Forest, to intervenor Seneca Jones Timber Company (Seneca *1094 Jones). Petitioners sought a declaration that ODSL was required by ORS 530.450 to withdraw the East Hakki Ridge parcel from sale and an injunction preventing or setting aside the sale. The circuit court concluded that petitioners lacked standing to challenge ODSL's order, and, accordingly, it dismissed the petition without reaching the merits of petitioners' challenge.
On appeal, in addition to arguing that they have standing, petitioners argue that we should reach the merits of their challenge, which is that ODSL violated ORS 530.450 when it sold part of the Elliot State Forest to Seneca Jones. ODSL and Seneca Jones respond that petitioners lack standing and that, even if petitioners have standing, ODSL's decision should be affirmed because ORS 530.450 violates the Oregon Constitution and, hence, is void. We conclude that petitioners have standing to bring their challenge and that we should reach the merits of petitioners' challenge under the circumstances of this case. As to the merits, we conclude that ORS 530.450 is constitutional and that ODSL violated that statute when it sold the East Hakki Ridge parcel to Seneca Jones. Accordingly, we reverse and remand the judgment of the circuit court.
The relevant facts are undisputed. When Oregon was admitted into the union on February 14, 1859, the United States agreed to transfer certain federal land to Oregon for support of Oregon schools. See State of Or. By and Through Div. of State Lands v. Bureau of Land Management , 876 F.2d 1419, 1421 (9th Cir. 1989) (explaining that Oregon Admission Act, 11 Stat 383, section 4, created an obligation on the United States to grant to Oregon sections 16 and 32 of every township in Oregon for use of schools). Because the designated lands were not all available to be conveyed to Oregon at statehood, Congress enacted statutes that authorized states to select other federal public land in lieu of *130 unavailable sections. Id. The land that the United States granted to Oregon is referred to as the "common school lands."
Pursuant to a 1927 presidential proclamation, Oregon received a large tract of common school lands from the United States in lieu of designated lands that were not available to be conveyed to Oregon at statehood. Oregon obtained the lands through written instruments called "clear lists." Id. at 1423. " 'A clear list is a government list of lands, title to which has been cleared to a party. It transfers title as effectively as a patent.' " Id . at 1423 n. 3 (quoting Oregon v. Bureau of Land Management , 676 F.Supp. 1047, 1055 (D. Or. 1987) ). The United States approved the clear lists, transferring title to the "in-lieu land" to Oregon. Id. at 1423.
What is now called the Elliot State Forest was created when Oregon received those in-lieu lands from the United States. Thus, the Elliot State Forest is part of the common school lands that the State Land Board is directed by the Oregon Constitution to manage for the benefit of the people of Oregon. See Or. Const., Art. VIII, §§ 2, 5. ODSL is the administrative arm of the State Land Board.
The East Hakki Ridge parcel is within the Elliot State Forest and is made up of 788 acres, over four tax lots, that are part of the common school lands. Oregon acquired one of the tax lots from a private party in 1983. Oregon selected the remaining three tax lots as part of the lands that it acquired from the United States as in-lieu land. In 2013, the cost of managing the Elliot State Forest exceeded the revenue generated by timber sales within the forest. Because of the net loss to the common school fund, the State Land Board approved offering the East Hakki Ridge parcel for sale. Seneca Jones bought the East Hakki Ridge parcel through a sealed-bid auction, and the sale was memorialized in a purchase and sale agreement (PSA) on April 15, 2014.
Petitioners petitioned for review in the circuit court of ODSL's decision to sell the East Hakki Ridge parcel, identifying the signed PSA as the final agency order that they were challenging. After a hearing on the petition based on *131 stipulated evidence, the circuit court concluded that petitioners did not have standing to challenge the sale and entered a judgment dismissing their petition *1095 for judicial review.[1] Petitioners appeal that judgment.
To seek judicial review, a petitioner must have "standing" to do that. " 'Standing' is a legal term that identifies whether a party to a legal proceeding possesses a status or qualification necessary for the assertion, enforcement, or adjudication of legal rights or duties." Kellas v. Dept. of Corrections , 341 Or. 471, 476-77, 145 P.3d 139 (2006). "The source of law that determines that question is the statute that confers standing in the particular proceeding that the party has initiated, 'because standing is not a matter of common law but is, instead, conferred by the legislature.' " Id. at 477, 145 P.3d 139 (quoting Local No. 290 v. Dept. of Environ. Quality , 323 Or. 559, 566, 919 P.2d 1168 (1996) ). Thus, we must look to ORS 183.480 to determine whether petitioners have standing to seek judicial review in this case.
Under ORS 183.480(1), a person may seek judicial review of an agency order in an other than contested case if the person is "adversely affected or aggrieved" by the order.[2] In People for Ethical Treatment v. Inst. Animal Care , 312 Or. 95, 101-02, 817 P.2d 1299 (1991) ( PETA ), the Supreme Court concluded that
"a person is 'aggrieved' under ORS 183.480(1) if the person shows one or more of the following factors: (1) the person has suffered an injury to a substantial interest resulting directly from the challenged governmental action; (2) the person seeks to further an interest that the legislature expressly wished to have considered; or (3) the person has such a personal stake in the outcome of the controversy as to assure concrete adverseness to the proceeding."
*132 (Citations omitted.) Because we conclude that petitioners have shown that they are "aggrieved" under the first factor listed above, we discuss only that factor.
For purposes of establishing their standing, petitioners submitted in the circuit court an affidavit from petitioner Laughlin. In that affidavit, Laughlin attested that he is the campaign director for petitioner Cascadia Wildlands and has "spent years of [his] life working to protect the forests, waters, and wildlife of the Elliot State Forest from clearcutting and other environmentally harmful practices." He attested that the Elliot State Forest and, in particular, the East Hakki Ridge parcel, are important to him and that he has visited the forest and parcel for work, recreation, and personal use to "enjoy hiking, looking for wildlife, and experiencing the peace and solitude of some of the last intact and unlogged coastal forests in Oregon." He also attested that he planned to continue to use and enjoy the East Hakki Ridge parcel in the future but was prevented from doing so after the sale to Seneca Jones because Seneca Jones had posted "no trespassing" signs around the parcel. In addition, he attested that Cascadia Wildlands, as an organization, has "dedicated a substantial amount of time, money, and energy into preserving the Elliot State Forest as a public space for public use and for the continuing benefit of the people, forests, waters and wildlife of this state" and has organized educational and recreational outings "in and about the Elliot State Forest."
On appeal, petitioners argue that they have standing under the first PETA factor because petitioner Laughlin has personally visited and enjoyed the East Hakki Ridge parcel, he had concrete plans to return to the parcel at the time that ODSL entered into the PSA with Seneca Jones, and, after the completion of the sale, he was excluded from visiting the parcel. Petitioners argue that selling the East Hakki Ridge parcel to Seneca Jones also directly affects Cascadia Wildlands' mission. In making those arguments, petitioners urge us to follow federal case law *1096 that has interpreted the "adversely affected or aggrieved" standing standard in the federal Administrative Procedure Act to confer standing on people whose affected interests are their use and enjoyment of public land, wildlife, or other natural resources. See, e.g. , *133 Summers v. Earth Island Institute , 555 U.S. 488, 494, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."); Sierra Club v. Morton , 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society[.]").
ODSL responds that petitioners cannot establish standing under the first PETA factor because the injuries that petitioners claim to have suffered from the sale of the East Hakki Ridge parcel are not a direct result of the sale. That is so, ODSL argues, because nothing in the PSA with Seneca Jones directed Seneca Jones to restrict the public's access to the parcel, and because the change in land ownership, in and of itself, did not deny petitioners' access to the parcel.
Seneca Jones responds that petitioners do not have standing for the same reason asserted by ODSL, and it makes two additional arguments. First, it argues that petitioners' access to and use of public land is not a "substantial interest" that can confer standing under ORS 183.480(1). Second, Seneca Jones argues that petitioners' interests are not within the "zone of interests" that are served by ORS 530.450 -the statute that petitioners seek to enforce-such that petitioners do not have standing even under the federal case law on which petitioners rely.
We begin by rejecting ODSL's and Seneca Jones' argument that petitioners have not identified an injury to their interests that is a direct result of the agency's action. As set out above, one of the ways that a person is aggrieved for purposes of ORS 183.480(1) is if "the person has suffered an injury to a substantial interest resulting directly from the challenged governmental action." PETA , 312 Or. at 101-02, 817 P.2d 1299. Both ODSL and Seneca Jones surmise that petitioners' harm is not a direct result of ODSL's action because the harm resulted from the independent action of Seneca Jones to exclude petitioners from the East Hakki Ridge parcel after the sale. That argument ignores, however, the *134 general rule that property ownership includes the right to exclude others. See, e.g. , State v. Hall , 181 Or. App. 536, 540, 47 P.3d 55 (2002) ("As a general rule, one of the incidents of property ownership is the right to invite other persons to use property or, conversely, to exclude them from doing so."). When ODSL sold the East Hakki Ridge parcel to Seneca Jones, it was also selling that right to exclude. Although ODSL is correct that Seneca Jones, or any private property owner, could choose to open its private property to the public, Seneca Jones is not required to do that, and it is the expected, nonspeculative result of selling public land to a private party for its use that the land will be closed to the public after the sale. That is, the closing of the East Hakki Ridge parcel to the public was not an independent, unexpected action of Seneca Jones; rather, it was the direct result of ODSL's decision to sell the East Hakki Ridge parcel to a private party.
We turn to Seneca Jones' argument that access to and use of public lands is not a substantial interest that can satisfy standing under the first PETA factor. In response, petitioners urge us to adopt the reasoning of federal courts and conclude that a substantial interest includes having "actually used and enjoyed the East Hakki Ridge parcel and [having] concrete plans to return." Because we are persuaded by the federal case law, we conclude that petitioners have identified an injury to a substantial interest that satisfies the first PETA factor for standing under ORS 183.480(1).
Under the federal Administrative Procedure Act, 5 USC section 702, "[a] person *** adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." For the injury prong of the federal standing *1097 requirements,[3] the person must allege an "injury in fact" that "is (a) concrete *135 and particularized and (b) actual or imminent, not conjectural or hypothetical." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. , 528 U.S. 167, 180-82, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ). Federal courts have long held that environmental and aesthetic injuries, such as injury to the use and enjoyment of public land, are sufficient to establish an "injury in fact," as long as the alleged injury is particularized to the person and not an injury that is felt the same by the public in general. See, e.g. , Sierra Club , 405 U.S. at 734, 92 S.Ct. 1361 ("Thus, in referring to the road to be built through Sequoia National Park, the complaint alleged that the development 'would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations.' We do not question that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing under [section 702 of the federal Administrative Procedure Act].").
Oregon appellate courts have not expressly stated, however, that an injury to a person's use and enjoyment of public land is a sufficient injury to establish standing under the Oregon Administrative Procedures Act to challenge agency orders that affect that land. The Oregon act provides, using language that is substantially similar to the federal Administrative Procedure Act that, "any person adversely affected or aggrieved by an order *** is entitled to judicial review of a final order." ORS 183.480(1). "Although federal precedent interpreting an analogous federal provision *** is not binding on this court when it interprets the law of this state, this court repeatedly has stated that Oregon courts may examine federal precedent for contextual support when they construe state statutes that parallel federal law." PSU Association of University Professors v. PSU , 352 Or. 697, 710-11, 291 P.3d 658 (2012). In particular, the Oregon Supreme Court has looked to United States Supreme Court cases for guidance as to the injuries that will suffice to establish standing as an aggrieved person *136 under the Oregon Administrative Procedures Act. See, e.g. , PETA , 312 Or. at 100 n. 6, 817 P.2d 1299 (noting that the legislative history of the Oregon Administrative Procedures Act indicates that the phrase "adversely affected or aggrieved" was intended to adopt the "broad rule of standing" in Ore. Newspaper Pub. v. Peterson , 244 Or. 116, 415 P.2d 21 (1966) ); Ore. Newspaper Pub. v. Peterson , 244 Or. 116, 121, 415 P.2d 21 (1966) (citing Pierce v. Society of Sisters , 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), for the proposition that standing "grows out of the allegation of a substantial injury directly resulting from the challenged governmental action"); see also PETA , 312 Or. at 102, 817 P.2d 1299 (relying on, among other cases, Multnomah County v. Talbot , 56 Or. App. 235, 242, 641 P.2d 617 (1982), opinion adopted , 294 Or. 478, 657 P.2d 684 (1983), to announce the test for when a person is "aggrieved" under ORS 183.480(1) ); Multnomah County v. Talbot , 56 Or. App. 235, 641 P.2d 617 (1982), opinion adopted , 294 Or. 478, 657 P.2d 684 (1983) (quoting Flast v. Cohen , 392 U.S. 83, 99, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), to set out the policy underlying standing requirement).
Here, Seneca Jones has not offered a principled reason based in Oregon law to conclude that the injuries alleged by petitioners are not sufficient to confer standing under ORS 183.480(1). We consider the long-standing precedent of the United States Supreme Court to be persuasive in this instance, and we therefore conclude that the injuries alleged by petitioner Laughlin to his use and enjoyment of the East Hakki Ridge parcel *1098 are an "injury to a substantial interest" under the first PETA factor for standing under ORS 183.480(1).
Finally, we reject Seneca Jones' assertion that petitioners' interests are insufficient because they do not fall within the "zone of interests" of ORS 530.450, the statute under which petitioners challenge the legality of ODSL's decision. Under federal law, standing includes meeting a general prudential standing requirement called the "zone of interests test." See Ashley Creek Phosphate Co. v. Norton , 420 F.3d 934, 939 (9th Cir. 2005), cert. den. , 548 U.S. 903, 126 S.Ct. 2967, 165 L.Ed.2d 950 (2006) ; see also MT & M Gaming, Inc. v. City of Portland , 360 Or. 544, 558-61, 383 P.3d 800 (2016) (explaining origins and development of the federal "zone of interests test"). That test "examines *137 whether 'a particular plaintiff has been granted a right to sue by the statute under which he or she brings suit.' " Ashley Creek Phosphate Co. , 420 F.3d at 939 (quoting City of Sausalito v. O'Neill , 386 F.3d 1186, 1199 (9th Cir 2004) ). When the statute under which the person seeks to bring suit is the federal Administrative Procedure Act, the standing requirement is that " 'the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute *** in question.' " Id. at 939-40 (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp , 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) (brackets and ellipses in Ashley Creek Phosphate Co. ) ). "The zone of interests test is not intended to impose an onerous burden on the plaintiff and 'is not meant to be especially demanding.' " Id. at 940 (quoting Clarke v. Securities Industry Ass'n , 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) ). However, when "the plaintiff is not 'the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.' " Id. (quoting Clarke , 479 U.S. at 399, 107 S.Ct. 750 ).
Seneca Jones argues that the purpose of ORS 530.450"is to devote certain lands for timber production to generate revenue for the education of Oregon's school children," and that the interest petitioners seek to protect-access to and enjoyment of the East Hakki Ridge parcel-does not fall within the interests that ORS 530.450 seeks to protect.
Unlike with regard to who may be "aggrieved" under the Oregon Administrative Procedures Act, the Oregon Supreme Court has not cited favorably to federal case law with respect to the standing requirement embodied in the "zone of interests test." In rejecting the application of the "zone of interests test" to standing under Oregon's declaratory judgments act, the Oregon Supreme Court explained that
"[t]his court has never referred to such a general standing requirement-prudential or otherwise-in cases where the issue might be expected to arise. And, in the absence of any statement about the requirement in our cases, the *138 usual justification for generally applying a zone of interest requirement also is absent: One cannot presume that the legislature has been legislating with such a requirement in mind."
MT & M Gaming, Inc. , 360 Or. at 562, 383 P.3d 800. For the same reasons, we reject Seneca Jones' argument that the federal "zone of interests test" must be applied here under the first PETA factor for standing under the Oregon Administrative Procedures Act.
In addition, we decline to apply the "zone of interests test" to standing under ORS 183.480(1) because application of that test in the manner advocated by Seneca Jones is not consistent with PETA . As set out above, PETA describes three ways in which a petitioner may establish standing under the Oregon Administrative Procedures Act:
"(1) the person has suffered an injury to a substantial interest resulting directly from the challenged governmental action; (2) the person seeks to further an interest that the legislature expressly wished to have considered; or (3) the person has such a personal stake in the outcome of the controversy as to assure concrete adverseness to the proceeding."
*1099 PETA , 312 Or. at 101-02, 817 P.2d 1299 (citations omitted). By arguing that petitioners must meet the "zone of interests test" to establish a substantial interest under the first PETA factor, Seneca Jones acknowledges that it is essentially requesting that we require petitioners to meet the second PETA factor, in addition to the first factor. To require petitioners to do that, however, would be a fundamental misapplication of the law articulated in PETA , which expressly sets out the three standing factors as disjunctive. That is, a petitioner need only meet one factor to establish standing. Thus, we conclude that the federal "zone of interests test" does not apply when a petitioner seeks to establish standing under ORS 183.480(1) under the first PETA factor.
Because, as explained above, petitioner Laughlin met the first PETA factor, petitioners have standing to bring their petition, and the trial court erred in dismissing it. See WaterWatch v. Water Resources Commission , 199 Or. App. 598, 603, 112 P.3d 443 (2005) ("Because Bachman has statutory *139 and constitutional standing and because he and the other petitioners make the same arguments on review, it is immaterial whether the other petitioners have standing[.]").
Having resolved standing in favor of petitioners, the parties have requested that we address the merits of their dispute notwithstanding that the trial court did not reach them. We conclude that it is appropriate for us to reach the merits in the circumstances of this case: The record is fully developed-viz. , the merits of the parties' dispute were briefed and argued at an evidentiary hearing on the petition; the parties raise only issues of law on the merits on appeal; and our standard of review on appeal from a circuit court judgment in an other than contested case means that "in practical effect" we directly review the agency's order for legal error. ORS 183.484(5) (setting out standards for judicial review in an other than contested case); Papworth v. DLCD , 255 Or. App. 258, 265, 296 P.3d 632 (2013) ("In practical effect, that means that we directly review the agency's order for compliance with the standards set out in ORS 183.484(5)." (Internal quotation marks omitted.) ).
Turning to the merits, petitioners assert that ODSL's sale of the East Hakki Ridge parcel is prohibited by ORS 530.450. That statute provides:
"Any lands in the national forests on February 25, 1913, selected by, and patented to, the State of Oregon, for the purpose of establishing a state forest, hereby are withdrawn from sale except as provided in ORS 530.510. The state forest shall be known as the Elliott State Forest."
ORS 530.450. ODSL does not contest that its sale of the East Hakki Ridge parcel violates ORS 530.450. Rather, ODSL argues that the statute is void because it violates the Oregon Constitution. Seneca Jones, however, does additionally argue that ORS 530.450 does not apply to the sale. Because we seek to resolve cases on a subconstitutional basis when we can, we first address Seneca Jones' argument that ORS 530.450 does not apply here.
Seneca Jones contends that ORS 530.450, by its terms, applies only to lands "patented" to Oregon from the United States. Because the East Hakki Ridge parcel is part *140 of land that the United States conveyed to Oregon using "clear lists" and not by "patent," Seneca Jones asserts that ORS 530.450 has no application here.
We reject Seneca Jones' reading of ORS 530.450. That statute uses the word "patent" as a verb and not to designate a particular type of conveyance that had to be used for the statute to apply to the lands granted to Oregon by the United States. See Webster's Third New Int'l Dictionary 1654 (unabridged ed. 2002) (as relevant, defining the verb "patent" as "to obtain or grant a patent right (as land or minerals)"). Here, the United States granted, and Oregon obtained, the in-lieu land through clear lists, which Congress intended to, and which did, convey fee simple title to that land to Oregon. See An act to vest in the several States and Territories the title in fee of the Lands which have been or may be certified to them, Aug 3, 1854, 10 Stat 346 (providing that lists certified by the Commissioner of the General Land-Office "shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated *1100 by such act of Congress, and intended to be granted thereby"). Additionally, as petitioners point out, ORS 530.450 expressly identifies the land to which it applies as the land obtained for the purpose of establishing a state forest, which it named the Elliot State Forest, and which it is undisputed was land conveyed to Oregon using the clear lists. From the plain text of the statute, the legislature intended ORS 530.450 to apply to the in-lieu land that Oregon obtained from the United States through clear lists. Accordingly, we conclude that ORS 530.450 applies to the East Hakki Ridge parcel and, under its plain text, prohibited the sale of that parcel.[4]
We turn to ODSL's constitutional arguments. ODSL contends that ORS 530.450 does not prohibit the sale of the East Hakki Ridge parcel because that statute violates both Article VIII, section 5, of the Oregon Constitution and the *141 separation of powers doctrine that is embodied in Article III, section 1, of the Oregon Constitution and, hence, is void. As to the first argument, ODSL contends that we should look to the version of Article VIII, section 5, that was in effect in 1957 when the current version of ORS 530.450 was enacted.[5] ODSL asserts that ORS 530.450 directly conflicts with that version of Article VIII, section 5, because it attempts to restrict the powers granted to the State Land Board to sell school lands, and, thus, the statute has been void since its enactment. ODSL further argues that a 1968 amendment to Article VIII, section 5, cannot "revive" ORS 530.450 such that it is no longer void.
We will first look to the original version of Article VIII, section 5 (1857), to determine whether ORS 530.450 violates that constitutional provision, because that is the version that was in effect when the legislature enacted the current version of ORS 530.450. See People's Util. Dist. et al. v. Wasco Co. et al , 210 Or. 1, 12-13, 305 P.2d 766 (1957) (declaring void a 1939 law based on constitutional provision that was in effect before 1952 amendment to that provision and holding that 1952 constitutional amendment did not revive the void law because the amendment did not express an intention to apply retroactively). When construing an original constitutional provision, we look at "[i]ts specific wording, the case law surrounding it, and the historical circumstances that led to its creation." Priest v. Pearce , 314 Or. 411, 415-16, 840 P.2d 65 (1992).
Article VIII, section 5 (1857), provided:
"The Governor, Secretary of State, and State Treasurer shall constitute a Board of Commissioners for the sale of school and university lands, and for the investment of the funds arising therefrom, and their powers and duties shall be such as may be prescribed by law : Provided , That no part of the university funds, or of the interest arising therefrom, shall be expended until the period of ten years from the adoption of this constitution, unless the same shall be *142 otherwise disposed of by the consent of congress for common school purposes."[6]
Under the specific wording of Article VIII, section 5 (1857), the State Land Board was created for the purpose of selling school *1101 lands and investing the funds arising from those lands-viz ., the lands and funds comprising the common school fund described in Article VIII, section 2, of the Oregon Constitution.[7] In the same sentence that identifies the purpose for the creation of the State Land Board is a provision that authorizes the legislature to prescribe the powers and duties of the board-viz. , "and [the board's] powers and duties shall be such as may be prescribed by law." "[S]hall be such as may be prescribed by law" in this context *143 means that the legislature is constitutionally authorized to establish the contours of the State Land Board's powers and duties. See Webster's at 1792 (defining "prescribe" as "1 a : to lay down authoritatively as a guide, direction, or rule of action : impose as a peremptory order : dictate, direct, ordain * * * b : to specify with authority * * * c : to require (as a person) to follow a direction or rule of action"); see also Lane v. Coos County , 10 Or. 123, 126 (1882) ("Now under this provision of the constitution, the duties of the sheriff are not necessarily confined to the execution of orders, judgments and process of the county, the service of papers in actions and the like, but may include the performance of 'such other duties as may be prescribed by law.' Nor can it make any difference that the 'other duties,' which the legislature is authorized to impose, are even incongruous in their nature with those already existing, when the authority to impose such duties is derived from the paramount law.").
Thus, although Article VIII, section 5 (1857), provides for the creation of the State Land Board for the purpose of selling common school land and investing common school land funds, it also expressly authorizes the legislature to determine how those powers and duties will be exercised. ODSL's contention that the legislature constitutionally may prescribe only "additional" powers and duties to the State Land Board is inconsistent with the express text of Article VIII, section 5 (1857), and we reject it.
We are not aware of any relevant cases construing Article VIII, section 5 (1857), or of any useful history about its enactment. However, our reading is consistent with the Supreme Court's descriptions of the State Land Board's powers and duties under Article VIII, section 5 (1857). For example, in Robertson v. Low , 44 Or. 587, 594, 77 P. 744 (1904), the court recognized that, "[a]lthough [the State Land Board] constituted a part of the administrative department of the government under the constitution, it is nevertheless governed and controlled in the exercise of its functions by the legislature and the laws emanating therefrom." See also, e.g ., State Land Board v. Lee , 84 Or. 431, 439, 165 P. 372 (1917) ("The legislature has given the board a name by calling it the State Land Board, and, acting on *144 the authority of the Constitution, has prescribed the powers and duties of the board.").
Our reading also is consistent with a Supreme Court case that construed the meaning *1102 of "prescribed by law" with respect to the amended version of Article VIII, section 5, Johnson v. Dept. of Revenue , 292 Or. 373, 639 P.2d 128 (1982). In Johnson , the court addressed whether a tax on submerged and submersible lands was constitutional under the current version of Article VIII, section 5.[8] In doing so, it noted that both the original and amended versions of Article VIII, section 5, provide that the State Land Board's powers and duties are to be prescribed by law. With respect to the amended version of Article VIII, section 5, the court held that, as a result, "the determination of the proper use of common school funds is a legislative one , subject to the overall requirement [in amended Article VIII, section 5,] that the use have as its goal the greater public benefit." Id. at 382, 639 P.2d 128 (emphasis added).
Turning back to the statute at issue, ORS 530.450 is a statute prescribing the powers and duties of the State Land Board because it places limits on the State Land Board's power to sell certain school land, namely, land in the Elliot State Forest. ODSL reads the statute as removing a constitutional power of the State Land Board, which it argues is impermissible. Such a reading, however, is contrary to the text of ORS 530.450, which provides that Elliot State Forest lands "hereby are withdrawn from sale except as provided in ORS 530.510." That text does not express an intention by the legislature to "remove" a power that the constitution has granted to the State Land Board; rather, it expresses an intention to direct the State Land Board on how it is to exercise its power to sell land with respect to the Elliot State Forest-viz. , it is directed not to sell that specific land except under circumstances not applicable here. ORS 530.450 does not conflict with Article VIII, section 5 (1857)-as argued by ODSL-because that *145 constitutional provision expressly contemplates that the legislature would have the power to determine the contours of the State Land Board's powers and duties with respect to school lands.[9]
ODSL also argues that ORS 530.450 is unconstitutional because it violates the separation of powers doctrine in Article III, section 1. That provision states that "[t]he powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these branches, shall exercise any of the functions of another, except as in this Constitution expressly provided." Or. Const., Art. III, § 1. There are "two inquiries to determine whether there is a separation-of-powers violation." Rooney v. Kulongoski (Elections Division # 13) , 322 Or. 15, 28, 902 P.2d 1143 (1995). "The first inquiry is whether one department of government has 'unduly burdened' the actions of another department in an area of responsibility or authority committed to that other department." Id. "The second inquiry is whether one department is performing the functions committed to another department." Id. Because the roles of governmental actors intersect in material *1103 ways, "the separation of powers does not require or intend an absolute separation between the departments of government." Id. "[A] violation of separation of powers may be found only if the problem is clear." Id. *146 Here, ODSL argues that ORS 530.450 unduly burdens the core function of the State Land Board, which is to use school lands to achieve the greatest financial benefit for the people of Oregon. ODSL asserts that ORS 530.450 does that by restricting its power to sell school lands, which it needs to do to fulfill its core function. Seneca Jones joins that argument, while also invoking the Oregon Admission Act as a source of the State Land Board's fiduciary duty to maximize revenue, and asserts that any statute that directs common school land to be put to a purpose other than generating revenue for schools is unlawful. Seneca Jones asserts that ORS 530.450 is such a statute because it prevents the State Land Board from selling property that the board has deemed it needs to sell to carry out its fiduciary duty of maximizing revenue. ODSL additionally argues that the statute violates the separation-of-powers doctrine because it results in the legislature usurping functions committed to the State Land Board-viz. , the function of selling common school lands.
We reject ODSL's separation-of-powers argument for much the same reasons that we rejected its challenge to ORS 530.450 under Article VIII, section 5. Because ORS 530.450 was enacted under the constitutional authority granted to the legislature by Article VIII, section 5, to prescribe the powers and duties of the State Land Board, the statute does not violate the separation-of-powers doctrine. ORS 530.450 does not unduly burden the State Land Board's core function because the constitution itself subjects that core function to legislative direction. Moreover, the statute places only a limitation on the board's authority to sell certain common school lands; it does not unduly burden the State Land Board's core function to dispose of and manage school lands to achieve the greatest benefit to the public.[10] Finally, the statute does not express an intention by the legislature to perform a function committed to the State Land *147 Board. As explained above, ORS 530.450 merely directs how the State Land Board is to exercise its power to sell certain school lands; it does not operate to place that power with the legislature.
Accordingly, ODSL's final order selling the East Hakki Ridge parcel to Seneca Jones violated ORS 530.450 and must be set aside. See ORS 183.484(5)(a) ("The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall: (A) Set aside or modify the order; or (B) Remand the case to the agency for further action under a correct interpretation of the provision of law.").
Reversed and remanded.

On appeal, no party challenges the circuit court's determination that the PSA is a final order subject to judicial review under ORS 183.480.

ORS 183.480(1) provides:
"Except as provided in ORS 183.417(3)(b), any person adversely affected or aggrieved by an order or any party to an agency proceeding is entitled to judicial review of a final order, whether such order is affirmative or negative in form. A petition for rehearing or reconsideration need not be filed as a condition of judicial review unless specifically otherwise provided by statute or agency rule."

Federal standing has three requirements that the aggrieved party must show:
"(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."
Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. , 528 U.S. 167, 180-82, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting Lujan v. Defenders of Wildlife , 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ).

As set out earlier, one of the four tax lots that make up the East Hakki Ridge parcel was obtained from a private party and is not land "selected by, and patented to" Oregon. However, none of the parties has attempted to make any distinction in how that tax lot should be treated in this case, given the different manner in which it was obtained. For that reason, we also do not attempt to distinguish that tax lot from the whole of the East Hakki Ridge parcel.

ORS 530.450 was first enacted in 1913 and withdrew the designated school lands from sale for 50 years. See Or. Laws 1913, ch. 124, § 1. It was amended in 1957 to its current version, which places no time limit on the withdrawal of the affected land from sale. See Or. Laws 1957, ch. 240, § 1.

Article VIII, section 5, was amended in 1968 to now provide:
"(1) The Governor, Secretary of State and State Treasurer shall constitute a State Land Board for the disposition and management of lands described in section 2 of this Article, and other lands owned by this state that are placed under their jurisdiction by law. Their powers and duties shall be prescribed by law.
"(2) The board shall manage lands under its jurisdiction with the object of obtaining the greatest benefit for the people of this state, consistent with the conservation of this resource under sound techniques of land management."

The original version of Article VIII, section 2, provided:
"The proceeds of all the lands which have been or hereafter may be granted to this state, for educational purposes (excepting the lands heretofore granted to and (aid) in the establishment of a university), all the moneys and clear proceeds of all property which may accrue to the state by escheat or forfeiture; all moneys which may be paid as exemption from military duty; the proceeds of all gifts, devises and bequests, made by any person to the state for common school purposes; the proceeds of all property granted to the state when the purposes of such grant shall not be stated; all the proceeds of the five hundred thousand acres of land to which this state is entitled by the provisions of an act of congress, entitled 'An act to appropriate the proceeds of the sales of the public lands, and to grant pre-emption rights, approved September 4, 1841,' and also the five per centum of the net proceeds of the sales of the public lands, to which this state shall become entitled on her admission into the Union (if congress shall consent to such appropriation of the two grants last mentioned) shall be set apart as a separate and irreducible fund, to be called the common school fund, the interest of which, together with all other revenues derived from the school land mentioned in this section, shall be exclusively applied to the support and maintenance of common schools in each school district, and the purchase of suitable libraries and apparatus therefor."
Or. Const., Art. VIII, § 2 (1857). That section has since been amended several times, including a significant amendment in 1968 that also amended Article VIII, section 5. See Johnson v. Dept. of Revenue , 292 Or. 373, 380-82, 639 P.2d 128 (1982) (discussing 1968 amendment to Article VIII, section 2 ).

The law at issue in Johnson was tested under the current version of Article VIII, section 5, because, before the 1968 amendment of Article VIII, submerged and submersible lands were not lands that were "school land" made part of the "common school fund" under Article VIII, section 2. See Johnson , 292 Or. at 379-80, 639 P.2d 128.

Kubli v. Martin , 5 Or. 436 (1875), on which ODSL relies, is not contrary to our conclusion. In that case, a statute directed county treasurers to make loans on the school funds in their respective counties. The statute also provided that "nothing in this chapter shall be so construed as to deprive the State of the right to control the common school fund created by the sale of school lands." Id. at 437. The court remarked that, if the statute "operates to take away the control of the common school fund from the [State Land Board], it must be regarded as unconstitutional." Id. at 438. However, the court determined that, because of the quoted language from the statute, taking control away from the board was not the intention of the legislature, and, thus, the statute made county treasurers mere agents of the board. Id.
In making those statements, the court was not addressing a mere limitation on a power of the State Land Board but, rather, an argument that a statute had removed a power from the State Land Board and had reassigned that power to the counties to exercise. As explained above, ORS 530.450 does not divest the State Land Board of a power granted to it by the constitution by giving that power to someone else; it only places a limitation on how the board may exercise that power.

We recognize that the record contains evidence that, in recent years, the cost of managing the Elliot State Forest has exceeded the revenue generated by timber sales within the forest. However, we are asked by the parties to consider the constitutionality of ORS 530.450 under the separation-of-powers doctrine based on whether the statute violated that doctrine when the statute was enacted, so we do not consider that evidence in our analysis.