Argued and submitted June 4; decision of Court of Appeals affirmed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings November 27, 2019; petition for reconsideration denied January 16, 2020

CASCADIA WILDLANDS,
an Oregon nonprofit corporation;
Audubon Society of Portland,
an Oregon nonprofit corporation;
The Center for Biological Diversity,
a California corporation; and
Joshua Laughlin,
*Respondents on Review,*

*v.*

OREGON DEPARTMENT OF STATE LANDS,
an administrative agency of the State of Oregon,
*Petitioner on Review,*

*and*

SENECA JONES TIMBER COMPANY, LLC,
an Oregon limited liability company,
*Petitioner on Review.*

(CC 62-14-07847) (CA A159061) (SC S066223)

452 P3d 938

The State Land Board voted to sell a parcel of the Elliott State Forest to Seneca Jones Timber Company, LLC. Cascadia Wildlands and others challenged the sale on the ground that the land in question was part of common school lands that the federal government had granted to the state and was prohibited from being sold under ORS 530.450. That statute indefinitely removed from sale any national forest land transferred to the state for the purpose of establishing a state forest. Seneca Jones and the Department of State Lands, which administered the sale, challenged the constitutionality of ORS 530.450. *Held*: ORS 530.450 is not inconsistent with Article VIII, section 5, of the Oregon Constitution, as originally enacted and as amended, and it does not violate the constitutional separation of powers doctrine.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Carson L. Whitehead, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review Oregon Department of State Lands. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Michael E. Haglund, Haglund Kelley LLP, Portland, argued the cause and filed the briefs for petitioner on review Seneca Jones Timber Company, LLC. Also on the briefs was Dominic M. Carollo, Roseburg.

Daniel Kruse, Kruse & Saint Marie, Attorneys at Law, LLC, Eugene, argued the cause and filed the brief for respondents on review.

NAKAMOTO, J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

---

\* On appeal from Lane County Circuit Court, Karsten H. Rasmussen, Judge. 293 Or App 127, 427 P3d 1091 (2018).

**NAKAMOTO, J.**

What is now known as the State Land Board was created by Article VIII, section 5, of the Oregon Constitution (1857) "for [among other things] the sale of school, and university lands" that had been granted to the state by the federal government when Oregon was admitted to the Union. This case arose when the State Land Board voted to sell a parcel of the Elliott State Forest, part of the common school lands granted to the state. The circuit court dismissed the petition for judicial review of the order of sale brought by Cascadia Wildlands and three other petitioners, based on their lack of standing. The Court of Appeals concluded that there was standing and decided the issue presented on review. *Cascadia Wildlands v. Dept. of State Lands*, 293 Or App 127, 427 P3d 1091 (2018). That issue is whether ORS 530.450—which prohibits the State Land Board from selling a part of the school and university lands, including the parcel of the Elliott State Forest that was subject to sale—unconstitutionally restricts the power of the State Land Board to carry out its constitutional duty and, thus, has been void since enactment. For reasons set forth below, we affirm the decision of the Court of Appeals upholding the constitutionality of ORS 530.450 and reverse and remand the judgment of the circuit court.

## I. BACKGROUND

A. *Common School Lands*

The facts related to the parcel of the Elliott State Forest subject to sale and its status as "common school lands" are undisputed. Oregon was admitted into the Union in 1859, under the Oregon Admission Act. Act of Feb 14, 1859, ch 33, 11 Stat 383. Under that Act, the United States agreed to provide certain federal land to Oregon "for the use of schools":

> "That the following propositions be, and the same are hereby, offered to the said people of Oregon for their free acceptance or rejection, which, if accepted, shall be obligatory on the United States and upon the said State of Oregon, to wit: First, That sections numbered sixteen and thirty-six in every township of public lands in said State, and where either of said sections, or any part thereof, has

been sold or otherwise been disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to said State for the use of schools."

*Id*. § 4.[1]

The foregoing passage recognized that certain parts of the land granted to the state might be unavailable. As the United States Supreme Court explained, to address that problem, Congress permitted states to select other public lands in lieu of the unavailable sections. *United States v. Morrison*, 240 US 192, 199, 36 S Ct 326, 60 L Ed 599 (1916).

That selection of other lands happened in Oregon. As pertinent here, in 1853, Congress enacted a statute authorizing the Legislative Assembly of the Territory of Oregon,

"in all cases where the sixteen or thirty-six sections, or any part thereof, shall be taken and occupied under the law making donations of land to actual settlers, *** to select, in lieu thereof, an equal quantity of any unoccupied land in sections, or fractional sections, as the case may be."

Act of Jan 7, 1853, ch 6, § 1, 10 Stat 150. Congress further provided that, "when selections are made in pursuance of the provisions of the first section of this act, said lands so

---

[1] Beginning in 1802, the Acts of Congress admitting new states into the Union included grants of designated sections of federal lands for the support of public schools. *Andrus v. Utah*, 446 US 500, 506, 100 S Ct 1803, 64 L Ed 2d 458 (1980), *reh'g den*, 448 US 907, 100 S Ct 3051, 65 L Ed 2d 1137 (1980). As Justice Powell explained in his dissent in *Andrus*, that action addressed an inequity that existed between the original 13 states and the newly admitted states:

"When the first 13 States formed the Union, each State had sovereign authority over the lands within its borders. These lands provided a tax base for the support of education and other governmental functions. When settlers sought to carve the State of Ohio from the Northwest Territory in 1802, they encountered a different situation. Vast tracts within the boundaries of the proposed State belonged to the Federal Government. Thus, the new State's potential revenue base would be restricted severely unless the Federal Government waived its immunity from taxation. In order to place Ohio on an equal footing with the original States, Congress enacted a compromise drawn from the Land Ordinance of 1785 and the Northwest Ordinance of 1787. The compromise set a pattern followed in the admission of virtually every other State. Specific details varied from State to State, but the basic plan persisted. As consideration for each new State's pledge not to tax federal lands, Congress granted the State a fixed proportion of the lands within its borders for the support of public education."

*Id*. at 522-23 (Powell, J., dissenting; footnotes omitted).

selected, and their proceeds, shall be forever inviolably set apart for the benefit of common schools." *Id*. § 2. The lands granted to the state under the Admission Act, or in lieu thereof, are referred to as the "common school lands."

The Oregon Constitution, adopted by Oregon voters in 1857, addressed the management of common school lands in Article VIII. That original provision directed that proceeds from the management and sale of common school lands be set apart in a "common school fund" for the benefit of schools:

> "The proceeds of all the lands which have been, or hereafter may be granted to this state, for educational purposes (excepting the lands heretofore granted to, and in the establishment of a university) all the moneys, and clear proceeds of all property which may accrue to the state by escheat, or forfeiture, all moneys which may be paid as exemption from military duty, the proceeds of all gifts, devises, and bequests, made by any person to the state for common school purposes, the proceeds of all property granted to the state, when the purposes of such grant shall not be stated, all the proceeds of the five hundred thousand acres of land to which this state is entitled by provisions of an act of congress, entitled 'An act to appropriate the proceeds of the sales of the public lands, and to grant preemption rights, approved the fourth of September, 1841', and also the five per centum of the net proceeds of the sales of the public lands, to which this state shall become entitled on her admission into the union (if congress shall consent to such appropriation of the two grants last mentioned) shall be set apart as a separate, and irreducible fund to be called the common school fund, the interest of which together with all other revenues derived from the school lands mentioned in this section shall be exclusively applied to the support, and maintenance of common schools in each school district, and the purchase of suitable libraries, and apparatus therefore."

Or Const, Art VIII, § 2 (1857).

In addition, Article VIII, section 5 (1857), created a "board of commissioners," made up of the Governor, the Secretary of State, and the State Treasurer, "for the sale of school, and university lands, and for the investment of the funds arising there from[.]" Or Const, Art VIII, § 5 (1857).

Section 5 also provided that the board's "powers, and duties, shall be such as may be prescribed by law." *Id*. In 1968, Article VIII was amended by referendum. Or Laws 1969, p 6 (recording passage at May 28, 1968, special election). Thereafter, the board of commissioners initially described in Article VIII, section 5 (1857), was denominated the State Land Board. For ease of reference, we refer to the board of commissioners created by Article VIII, section 5, as the State Land Board.

In the years immediately following Oregon's admission to the Union, the state had a policy of disposing of common school lands, with the result that, by 1913, only a comparatively small part of the land originally transferred to the state "for the use of schools" remained. *The Twenty-fifth Annual Report of the State Forester of the State of Oregon to the Governor* 49 (1935). Many of the tracts that remained at that time were located within the boundaries of the national forests and were scattered and isolated, and, for that reason, their value to the state was rather small. *Id*.

In 1913, State Forester Francis Elliott began negotiating an agreement under which the remaining common school lands would be exchanged for a solid block of national forest land, with the ultimate objective of establishing a state forest. *Id*. Congress dictated that any national forest land granted to the state for school purposes must be withdrawn from sale for a period of 50 years. 32 Op Atty Gen 100 (1964) (quoting *The Twenty-fifth Annual Report of the State Forester* at 49). In preparation for such an agreement, and in compliance with the federal precondition for any such exchange, the Oregon Legislature enacted a statute that prohibited for 50 years the sale of any national forest lands granted by the federal government to the state for school purposes. *Id*.; Or Laws 1913, ch 124, § 1. In a preamble to that statute, the legislature stated that "it is the desire that said tract be set aside as a State forest and administered for the permanent good of the State and its educational institutions[.]" Or Laws 1913, ch 124.

In 1927, by presidential proclamation, the federal government transferred to the state approximately 70,000 acres of the Siuslaw National Forest in Coos and Douglas

Counties. Those 70,000 acres were partly in exchange for certain common school lands that had been transferred to the state at the time of admission and partly comprised land granted to the state in lieu of common school lands that were unavailable at the time of statehood. *State of Or. v. Bureau of Land Management*, 876 F2d 1419, 1423 (9th Cir 1989); Presidential Proclamation of April 28, 1927, 45 Stat 2907.

The 50-year withdrawal from sale of common school lands that was enacted by statute in 1913 would have expired in 1963. In 1957, however, the legislature enacted ORS 530.450, which indefinitely withdrew from sale any of the national forest lands transferred to the state for a state forest. That statute also named the state forest that had been created through the exchange of lands the Elliott State Forest, after the state forester who had been instrumental in its creation.[2] The Elliott State Forest is, thus, part of the common school lands that the State Land Board is directed by the constitution to manage for the benefit of schools.

B.  *Litigation Over the Sale of Part of the Elliott State Forest*

Over the years, the State Land Board managed the Elliott State Forest and generated revenue for the common school fund through timber sales, among other things. But in 2013, for the first time, the cost of managing the Elliott State Forest exceeded revenue. For that reason, the State Land Board voted to sell a part of the Elliott State Forest, known as the East Hakki Ridge parcel.

The Oregon Department of State Lands (ODSL), the administrative arm of the State Land Board, offered the East Hakki Ridge parcel for sale through an open bidding process. Seneca Jones Timber Company, LLC (Seneca Jones) was the sole bidder. The state accepted the bid, and the sale was memorialized in a purchase and sale agreement in April 2014.

---

[2] ORS 530.450 provides:

"Any lands in the national forests on February 25, 1913, selected by, and patented to, the State of Oregon, for the purpose of establishing a state forest, hereby are withdrawn from sale except as provided in ORS 530.510 [permitting the exchange of Elliott State Forest land or timber under certain conditions]. The state forest shall be known as the Elliott State Forest."

Cascadia Wildlands, the Audubon Society of Portland, the Center for Biological Diversity, and Joshua Laughlin (collectively, Cascadia Wildlands) petitioned the Lane County Circuit Court for judicial review of ODSL's purchase and sale agreement selling the East Hakki Ridge parcel to Seneca Jones. Cascadia Wildlands sought a declaration that ODSL was required under ORS 530.450 to withdraw the East Hakki Ridge parcel from sale, and it sought an injunction preventing or setting aside the sale. After determining that the agreement constituted ODSL's final order in other than a contested case, the circuit court concluded that Cascadia Wildlands lacked standing to challenge ODSL's sale of the East Hakki Ridge parcel. Consequently, the court dismissed the petition for judicial review without reaching the merits of Cascadia Wildlands' arguments.

Cascadia Wildlands appealed, and the Court of Appeals reversed the judgment of the circuit court. The Court of Appeals held, as an initial matter, that Cascadia Wildlands had standing to bring its challenges to the sale of the East Hakki Ridge parcel. *Cascadia Wildlands*, 293 Or App at 138. Turning to the merits, the court explained that Article VIII, section 5 (1857), of the Oregon Constitution, in providing that the State Land Board had such "powers, and duties * * * as may be prescribed by law," expressly contemplated that the legislature would have the authority to determine how the State Land Board exercises its powers and duties with respect to the sale of school lands, including the authority to direct the State Land Board not to sell certain land—namely, the Elliott State Forest—except under circumstances not applicable here. *Id.* at 144-45. Additionally, for similar reasons, the Court of Appeals held that ORS 530.450 did not violate the separation of powers doctrine. That is, the court held that ORS 530.450 does not unduly burden the State Land Board's "core function"—to "dispose of and manage [common school lands] to achieve the greatest benefit to the public"—nor does it usurp that core function, because the constitution itself subjects the State Land Board's core function to legislative direction. *Id.* at 146. The court explained that ORS 530.450 "merely directs how the State Land Board is to exercise *its* power to sell certain school lands; it does not operate to place

that power with the legislature." *Id*. at 147 (emphasis in original).

Ultimately, the Court of Appeals concluded that ORS 530.450 is constitutional and that ODSL violated that statute when it sold the East Hakki Ridge parcel to Seneca Jones. *Id.* We allowed the separate petitions for review filed by ODSL and by Seneca Jones.

## II.   ANALYSIS

On review, ODSL and Seneca Jones maintain that ORS 530.450 is void and has been so since its enactment in 1957, because the statute (1) directly conflicts with Article VIII, section 5, in its original form and as amended, and (2) violates the separation of powers doctrine by unduly burdening the State Land Board's core constitutional function. We conclude that neither of those arguments is well taken.

## A.   *Article VIII, Section 5*

Under the Admission Act, the state is the trustee of the lands granted to it by the federal government, with the obligation to hold the lands granted to it "for the use of schools." That Act provided that the terms under which the land was granted, "if accepted, shall be obligatory on the United States and upon the said State of Oregon." And, as we have discussed, upon ratification in 1857, the Oregon Constitution created the State Land Board to sell common school lands for the state and to manage the proceeds therefrom:

> "The Governor, Secretary of State, and State Treasurer shall constitute a board of commissioners for the sale of school, and university lands, and for the investment of the funds arising there from, *and their powers, and duties, shall be such as may be prescribed by law.*"

Or Const, Art VIII, § 5 (1857) (emphasis added).

ODSL and Seneca Jones premise their first argument challenging the constitutionality of ORS 530.450 on their understanding that that constitutional provision conferred on the State Land Board the constitutional "power" to sell common school lands and manage the proceeds, and that that power cannot be limited by the legislature, even

though the provision also states that the State Land Board's powers and duties "shall be such as may be prescribed by law." The plain meaning of that provision suggests that ODSL and Seneca Jones overstate their point.

The first clause of section 5 merely creates the board and states its purpose: the three state officials "shall constitute a board of commissioners for the sale of [common school lands] and for the investment of [the proceeds][.]" The wording is not directive. That is, it makes the board the body responsible for selling the lands (and managing any proceeds) if land is to be sold; it gives the board the *authority* to sell the lands and manage the proceeds. It does not directly give the board the *power* to decide whether to sell land or what land to sell, nor does it confer any other powers or duties on the board.

Instead, the second clause expressly gives the *legislature* the authority to prescribe the board's powers and duties. Over a century ago, this court explained the governing role of the legislature with respect to the State Land Board:

> "The board is the State's instrumentality for the sale and disposition of school lands. Although constituted a part of the administrative department of the government under the constitution, it is nevertheless governed and controlled in the exercise of its functions by the legislature and the laws emanating therefrom[.]"

*Robertson v. Low*, 44 Or 587, 594, 77 P 744 (1904). In a similar vein, several years later, this court again stated that the legislature could prescribe the powers and duties of the State Land Board:

> "By the terms of the Constitution the governor, secretary of state and state treasurer are made a board of commissioners for the sale of school lands and for the investment of the funds arising from such lands; and the powers and duties of the board 'shall be such as may be prescribed by law.' The legislature has given the board a name by calling it the State Land Board and, acting on the authority of the Constitution, has prescribed the powers and duties of the board. Every power conferred upon the board and every duty imposed upon it, whether conferred or imposed by the

Constitution or legislative enactment, is for the direct benefit of the state. The state land board exists for the sole purpose of serving the state. Every attribute given to it and every function performed by it is for the benefit of the commonwealth."

*State Land Board v. Lee*, 84 Or 431, 439, 165 P 372 (1917) (quoting Or Const, Art VIII, § 5 (1857)).

Two additional cases lend further support to our understanding of the respective roles of the legislature and the State Land Board under the Oregon Constitution. The first is *State v. Warner Valley Stock Co.*, 56 Or 283, 106 P 780, *reh'g den*, 56 Or 308, 108 P 861 (1910). That case arose out of the federal government's grant to the state of certain swamp land, which the State Land Board also was responsible for managing and selling. *Id.* at 287-88. The legislature had passed various laws directing certain procedures that had to be followed before the swamp land could be sold, including, among other things, selecting, describing, and surveying the land. The State Land Board had not performed any of those acts. *Id.* at 291-93. Nevertheless, it accepted applications for the purchase of the land, and it issued deeds to the swamp land to one of the defendants. *Id.* at 289-90. The state then sued that defendant, his successor, and settlers on the land to cancel the deeds. *Id.* at 287.

This court held that the deeds were void. In so holding, the court rejected the defendant's argument that, because the State Land Board had jurisdiction over the swamp land under statutes enacted after the land was granted to the state by the federal government, there was a presumption in favor of the validity of the deeds, and, if they had been issued improperly, they were merely voidable, not void. *Id.* at 297. The court emphasized that the powers of the State Land Board were limited to those prescribed and conferred by the legislature:

"Counsel for defendant bases much of his argument upon the assertion that the board had the right to sell swamp land, but, if he means original authority, this is an erroneous assumption, even as to school lands, which, by the constitution, are placed exclusively in the hands of the board. *Its powers are limited to such as shall be prescribed by law, and, as to the swamp land, it has no authority other*

> *than such as the legislature has conferred, and for every act of the board in relation thereto statutory authority must exist."*

*Id.* (emphasis added).

The second case is *State ex rel. [Thomas] v. Holman*, 142 Or 339, 20 P2d 430 (1933). In *Thomas*, the court addressed the authority of the State Treasurer, which Article VI, section 4, of the Oregon Constitution defines using wording that is identical to that used to define the authority of the State Land Board: "The powers, and duties of the treasurer of state shall be such as may be prescribed by law." 142 Or at 342. Treasurer Holman challenged the constitutionality of a statute that required the Treasurer to pay state warrants or else to endorse them in certain circumstances, arguing that that statute was an unconstitutional limitation of the Treasurer's powers and duties. *Thomas*, 142 Or at 341-42. In rejecting that argument, the court quoted Article VI, section 4, and stated,

> "It will thus be seen that the powers and duties of the Treasurer are such as may be prescribed by law and not otherwise. It will also be seen that the [challenged statutory] provision * * * merely defines the powers and duties of the State Treasurer, all of which were within the legislative control and did not in any way infringe upon any constitutional right or power conferred upon such officer."

*Id.* at 342.

As this court stated with respect to the State Land Board in *Warner Valley Stock Co.* and with respect to the State Treasurer in *Thomas*, the State Land Board's particular powers and duties are those conferred by the legislature. That is, the powers and duties of the State Land Board are "such as may be prescribed by law and not otherwise." *Thomas*, 142 Or at 342; *accord Warner Valley Stock Co.*, 56 Or at 297.

Indeed, as ODSL acknowledges, from virtually the beginning of statehood, the legislature has enacted legislation effectively dictating how the State Land Board was to carry out its authority to sell common school lands and manage the proceeds therefrom. In one early example, an 1866 statute governing sales of common school lands provided

to whom the lands could be sold and in what amounts, the price per acre, and financing conditions. That statute "authorized and required" the State Land Board to sell common school lands "to actual settlers," up to 320 acres, for the price of $1.25 per acre if the settler already occupied the land. General Laws of Oregon, Misc Laws, ch XXIX, title II, § 9, p 631 (Deady & Lane 1843-1872). When a settler sought to purchase school lands, the legislature authorized the purchaser to pay a third of the price in advance and to pay the remainder over time, at an annual interest rate of ten percent. *Id*. § 10, p 632. Notably, that statute also *required* the board to sell selected common school lands "as fast as such selections shall be approved." *Id*. at § 9, p 631.

In the only case called to the court's attention addressing the constitutionality of such legislation directing the State Land Board's powers and duties, *Kubli v. Martin*, 5 Or 436 (1875), this court upheld the legislature's authority to dictate how the State Land Board performed its duties, so long as the legislature did not take over the performance of those duties itself. In *Kubli*, the court addressed an 1865 statute that "required" county treasurers to lend common school funds under certain conditions aimed at increasing the likelihood of repayment, such as on one-year terms and with security by mortgage on real estate. General Laws of Oregon, Misc Laws, ch XXIX, title II, § 18, p 633 (Deady & Lane 1843-1872). That statute contained the further proviso that "[n]othing in this chapter shall be so construed as to deprive this state of the right to control the common school fund created by the sale of school lands." *Id*.

The appellants challenged the constitutionality of that statute under Article VIII, section 5, contending that it effectively granted county treasurers control over common school funds. *Kubli*, 5 Or at 437-38. This court stated that, if the statute "operates to take away the control of the common school fund from the Board," then "it must be regarded as unconstitutional[.]" *Id*. at 438. And if not, then "it must, of course, be declared an effective law." *Id.* The court concluded that the statute was constitutional, because the statutory proviso that the state maintained the right to control the common school fund created by the sale of state lands made clear that

> "the Legislative Assembly did not intend by the act to take away the control of the 'separate and irreducible fund' from the Board of Commissioners. The act, in effect, makes the county treasurers, in their respective counties, mere agents, subject to the control, direction, and authority of the Board."

*Id.*

The primary authorities and this court's case law thus confirm that, under the original text of Article VIII, section 5, the State Land Board is the body that conducts the sale of common school lands and that manages the proceeds therefrom, but its particular powers and duties are only those that the legislature prescribes. That is, the State Land Board exists to serve the state in carrying out its duties as trustee of common school lands held in trust for the people of Oregon in accordance with the Admission Act.

The same holds true under the current text of Article VIII, section 5.[3] In 1968, the voters approved amendments to Article VIII, section 2, and Article VIII, section 5. As this court explained in *Johnson v. Dept. of Revenue*, 292 Or 373, 382, 639 P2d 128 (1982), section 5 as amended "calls for the formation of the State Land Board to dispose of and manage lands described in section 2, and also lands owned by the state placed under the State Land Board's jurisdiction by law." Thus, "there was no longer a requirement that proceeds of common school lands be used 'exclusively' for educational purposes." *Johnson*, 292 Or at 382. As ODSL correctly states, "[n]othing in the text of the 1968 amendments or the contemporaneous materials suggests that voters intended to limit the State Land Board's constitutional power to sell common school land." The purpose of the 1968 amendments

---

[3] For their argument that the current version of ORS 530.450 has been void since its enactment in 1957, ODSL and Seneca Jones focus most of their attention on the original version of Article VIII, section 5. They then add that voters in 1968 did not change anything material to the State Land Board's power to sell common school lands and conclude that voters did not revive the statute or validate its constitutionality through ratification of amendments to Article VIII. We review the 1968 amendment of Article VIII from a different angle, given that we have concluded that the statute was not void upon enactment in 1957. We examine the 1968 amendment of Article VIII to determine whether it altered the legislature's authority to prescribe the State Land Board's powers and duties as originally provided by Article VIII, section 5 (1857).

to Article VIII was "to authorize the State Land Board to expend moneys in the common school fund to carry out its land management activities." *Id.* at 381. But, contrary to the position of ODSL and Seneca Jones that the State Land Board's authority to sell common school lands trumps any legislative determination regarding the best use of those lands for the state, this court explained that Article VIII, section 5, as amended in 1968, still provided for legislative determinations of the State Land Board's powers and duties and the best uses of common school funds:

> "*The powers and duties of the Land Board were and are to be prescribed by law.* Section 5(2) contains the requirement that such lands be managed with the object of obtaining the greatest benefit for the people of Oregon. Reading this provision according to its most plain and practical meaning, and consistently with the legislative history, the determination of the proper use of common school funds is a legislative one, subject to the overall requirement that the use have as its goal the greater public benefit."

*Johnson*, 292 Or at 382 (emphasis added).

In sum, in enacting ORS 530.450, the legislature defined the powers and duties of the State Land Board with respect to the Elliott State Forest; it did not infringe on any constitutional right or power conferred upon the State Land Board. We therefore hold that ORS 530.450 was not inconsistent with Article VIII, section 5 (1857); was not void at the time of its enactment in 1957; and is not inconsistent with Article VIII, section 5, now.

B.   *Separation of Powers Doctrine*

ODSL and Seneca Jones also contend that ORS 530.450 violates the separation of powers doctrine, because the statute burdens or usurps the State Land Board's core constitutional function. Article III, section 1, of the Oregon Constitution requires the three branches of state government to exercise their functions separately and exclusively:

> "The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these branches,

shall exercise any of the functions of another, except as in this Constitution expressly provided."

The legislative power is vested in the legislature, and the executive power is vested in the Governor. Or Const, Art IV, § 1; Or Const, Art V, § 1. The State Land Board is part of the executive branch and is a "co-ordinate department of state government." *Lee*, 84 Or at 439. According to ODSL and Seneca Jones, the legislative branch overstepped its authority and infringed on the functions of the executive branch by enacting ORS 530.450.

Specifically, ODSL and Seneca Jones contend that the legislature violated the separation of powers doctrine because ORS 530.450 unduly burdens the capacity of the State Land Board, a department of the executive branch, to perform its core function. *See State ex rel Metropolitan Public Defender v. Courtney*, 335 Or 236, 241, 64 P3d 1138 (2003) (stating that standard for finding a separation of powers violation). That core function, they contend—under both Article VIII, section 5 (1857), and Article VIII, section 5, as amended—is to "use lands dedicated to the common school fund in such a way as to derive the greatest net profit for the people of this state." *Johnson*, 292 Or at 382.

Thus, both ODSL and Seneca Jones assume that the Oregon Constitution invests the State Land Board with a specific financial core function. Additionally, Seneca Jones invokes the Admission Act as a source of the State Land Board's duty to maximize net revenue, which Seneca Jones again describes as a core function. We are not persuaded that the State Land Board's core function is to use the common school lands to generate the greatest net profit possible for the state.

As an initial matter, we reject Seneca Jones's argument about the core function of the State Land Board based on the Admission Act. The Admission Act granted the federal lands to the *state* in trust "for school purposes." The Admission Act does not have anything to say about the powers or duties of the State Land Board. Moreover, the Admission Act does not require the state to sell all its common school lands, nor does it prohibit the state, through the legislature, from deciding that retaining certain common

school lands as state forest land will provide long-term benefits to education.

We also disagree with the argument advanced by ODSL and Seneca Jones that the State Land Board is constitutionally required—and has a core function—to manage the common school lands so as to derive the "greatest net profit" for the state, regardless of the legislature's determinations about the best use of common school lands. That obligation does not appear as a core function in Article VIII, as originally ratified or as amended.

At the time ORS 530.450 was enacted, the State Land Board was charged with the responsibility to manage the common school fund for the exclusive benefit of public schools, as provided in Article VIII, section 2 (1857). That provision stated that the proceeds from the sale of common school lands were to be set aside in

> "a separate, and irreducible fund to be called the common school fund, the interest of which together with all other revenues derived from the school lands mentioned in this section shall be exclusively applied to the support, and maintenance of common schools in each school district, and the purchase of suitable libraries, and apparatus therefore."

And Article VIII, section 5, then provided that the State Land Board's function was to sell common school lands and invest the proceeds arising therefrom.

Now, Article VIII, section 2, no longer provides that the common school fund must be used exclusively for education purposes. *Johnson*, 292 Or at 382. And Article VIII, section 5(2), now directs the State Land Board to "manage lands under its jurisdiction with the object of obtaining *the greatest benefit for the people of this state*, consistent with the conservation of this resource under sound techniques of land management." (Emphasis added.)

In some circumstances, the "greatest benefit" mandate may require the State Land Board to maximize net profit, for example, by obtaining the best price for the authorized sale of timber on common school lands. But authority to "manage" common school lands for "the greatest benefit for the people of this state" does not mean that the State

Land Board can disregard legislation reflecting the legislature's determination about the best use of some common school lands in keeping with the *state's* trust obligation. In the early years of statehood, the state, through the legislature, determined that the best use of selected common school lands was to sell them "as fast as such selections shall be approved." General Laws of Oregon, Misc. Laws, ch XXIX, Title II, § 9, p 631 (Deady & Lane 1843-1872). In 1957, the legislature determined that the best use of some other common school lands was to maintain them in perpetuity as the Elliott State Forest, enacting ORS 530.450 in accordance with its constitutional authority.

In addition to rejecting the "generation of greatest net profit as core function" aspect of their argument supporting the sale of the East Hakki Ridge parcel, we also reject ODSL's and Seneca Jones's conclusions that ORS 530.450 violates the separation of powers doctrine set out in Article III, section 1. Article VIII, section 5 (1857), provided that the State Land Board's function was to sell common school lands and invest the proceeds arising therefrom. Article VIII, section 5, now authorizes the State Land Board to manage common school lands. The statute does not directly infringe on those functions—ORS 530.450 does not vest the power to sell common school lands, to manage proceeds of such sales, or to manage common school lands in the legislature or any other actor. As this court explained in *Kubli*, such an overt usurpation of the State Land Board's duties would be unconstitutional. 5 Or at 436.

At the same time, Article VIII, section 5, both originally and as amended, expressly provides that the legislature prescribes the powers and duties of the State Land Board. The statute was enacted under that constitutional authority, and its provisions constitute an exercise of the state's overarching duty as trustee of the common school lands. Thus, ORS 530.450 does not unduly burden the State Land Board's core function to sell common school lands and manage the proceeds, as originally provided in Article VIII, or to manage those lands to achieve the greatest benefit to the public, as provided in Article VIII as amended, because, as the Court of Appeals correctly noted, to the extent it does

so, the constitution itself subjects the State Land Board's core function to legislative direction. *Cascadia Wildlands*, 293 Or App at 146. As a result, we conclude that ORS 530.450 is not unconstitutional and is not void.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.