Argued and submitted November 9, 2022, reversed and remanded
February 15, 2023

For a Judicial Examination and Judgment of the Court
as to the Regularity, Legality, Validity and Effect of
the Columbia County Second Amendment Sanctuary
Ordinance

BOARD OF COUNTY COMMISSIONERS
OF COLUMBIA COUNTY,
a political subdivision of the State of Oregon,
*Petitioner-Respondent,*

*v.*

Ellen ROSENBLUM,
Attorney General for the State of Oregon,
*Interested Party-Appellant,*

*and*

Robert PILE,
Shana Cavanaugh, Brandee Dudzic,
and Joe Lewis,
*Interested Parties-Respondents,*

*and*

Raven Chris BRUMBLES;
Gun Owners of America, Inc.;
Gun Owners Foundation;
Oregon Firearms Federation;
Larry Erickson; Keith Forsythe;
and Ruth Nelson,
*Intervenors-Respondents.*

For a Judicial Examination and Judgment of the Court
as to the Regularity, Legality, Validity and Effect of
the Columbia County Second Amendment Sanctuary
Ordinance

BOARD OF COUNTY COMMISSIONERS
OF COLUMBIA COUNTY,
a political subdivision of the State of Oregon,
*Petitioner-Appellant,*

*v.*

Ellen ROSENBLUM,
Attorney General for the State of Oregon;
Robert Pile; Shana Cavanaugh;
Brandee Dudzic; and Joe Lewis,
*Interested Parties-Respondents,*
*and*

Raven Chris BRUMBLES;
Gun Owners of America, Inc.;
Gun Owners Foundation;
Oregon Firearms Federation;
Larry Erickson; Keith Forsythe;
and Ruth Nelson,
*Intervenors-Respondents.*

For a Judicial Examination and Judgment of the Court
as to the Regularity, Legality, Validity and Effect of
the Columbia County Second Amendment Sanctuary
Ordinance

BOARD OF COUNTY COMMISSIONERS
OF COLUMBIA COUNTY,
a political subdivision of the State of Oregon,
*Petitioner-Respondent,*

*v.*

Ellen ROSENBLUM,
Attorney General for the State of Oregon,
*Interested Party-Respondent,*
*and*

Robert PILE,
Shana Cavanaugh, Brandee Dudzic,
and Joe Lewis,
*Interested Parties-Appellants,*
*and*

Raven Chris BRUMBLES;
Gun Owners of America, Inc.;
Gun Owners Foundation;
Oregon Firearms Federation;
Larry Erickson; Keith Forsythe;
and Ruth Nelson,
*Intervenors-Respondents.*

## Columbia County Circuit Court
## 21CV12796; A176726

526 P3d 798

The Attorney General for the State of Oregon, the Board of Commissioners of Columbia County (the board), and several residents of Columbia County, appeal a judgment dismissing a petition in a validation proceeding brought by the board seeking a judicial determination as to whether an ordinance approved by the board was preempted by state and federal law. The trial court dismissed the case for want of justiciability. *Held*: The Court of Appeals concluded that the trial court erred; the board's petition presented a justiciable controversy. The court also concluded that it was appropriate to reach the merits of the board's petition, and that the ordinance was preempted by ORS 166.170 and therefore void.

Reversed and remanded.

Ted E. Grove, Judge.

Steven C. Berman argued the cause for appellants-respondents Robert Pile, Shana Cavanaugh, Brandee Dudzic and Joe Lewis. Also on the briefs were Lydia Anderson-Dana and Stoll Stoll Berne Lokting & Shlachter P.C. and Len Kamdang, Mark Weiner, and Everytown Law, New York.

Matthew J. Kalmanson argued the cause for appellant-respondent Board of County Commissioners of Columbia County. Also on the briefs was Hart Wagner, LLP.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Patricia G. Rincon, Assistant Attorney General, filed the briefs for appellant State of Oregon.

Tyler D. Smith argued the cause for respondents Raven Chris Brumbles, Larry Erickson, Keith Forsythe, Gun Owners Foundation, Gun Owners of America, Inc., Ruth Nelson, and Oregon Firearms Federation. Also on the brief was Tyler Smith & Associates, P.C.

P. Andrew McStay, Jr., and Davis Wright Tremaine LLP filed the brief *amicus curiae* for Giffords Law Center to Prevent Gun Violence.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

TOOKEY, P. J.

Reversed and remanded.

Egan, J., concurring.

**TOOKEY, P. J.**

In this case concerning firearms, we determine that we have jurisdiction to consider whether Columbia County's "Second Amendment Sanctuary Ordinance," Ordinance No. 2021-1 (the Ordinance), is void because it is preempted by ORS 166.170.[1] Having made that determination, we conclude that the Ordinance is preempted by ORS 166.170, and it is therefore void.

In this case, the Attorney General for the State of Oregon, the Board of Commissioners of Columbia County (the Board), and several residents of Columbia County (the Residents), appeal a judgment dismissing a petition in a validation proceeding brought by the Board pursuant to ORS 33.710.[2] In the validation proceeding, the Board sought a judicial determination as to whether the Ordinance was preempted by state and federal law.

The Ordinance—titled "In the Matter of Declaring a Second Amendment Sanctuary in Columbia County"—finds that "all local, state, and federal acts, laws, orders, rules or regulations regarding firearms, firearms accessories, and ammunition are a violation of the Second Amendment." It requires that, with limited exception, "[a]ll local, state and federal acts, laws, rules or regulations, originating from jurisdictions outside of Columbia County,

---

[1] ORS 166.170 provides:

"(1) Except as expressly authorized by state statute, the authority to regulate in any matter whatsoever the sale, acquisition, transfer, ownership, possession, storage, transportation or use of firearms or any element relating to firearms and components thereof, including ammunition, is vested solely in the Legislative Assembly.

"(2) Except as expressly authorized by state statute, no county, city or other municipal corporation or district may enact civil or criminal ordinances, including but not limited to zoning ordinances, to regulate, restrict or prohibit the sale, acquisition, transfer, ownership, possession, storage, transportation or use of firearms or any element relating to firearms and components thereof, including ammunition. Ordinances that are contrary to this subsection are void."

[2] ORS 33.710 provides, in pertinent part, that the "governing body" of a "municipal corporation" may "commence a proceeding in the circuit court *** for the purpose of having a judicial examination and judgment of the court as to the regularity and legality of" any "ordinance, resolution or regulation enacted by the governing body."

which restrict or affect an individual person's general right to keep and bear arms, including firearms, firearm accessories or ammunition *** shall be treated as if they are null, void and of no effect in Columbia County, Oregon." And it prohibits "agents, employees, and officials of Columbia County" from "knowingly and willingly" participating "in any way in the enforcement" of such acts, laws, rules, or regulations.

After the Board filed the petition, in accordance with the intervention procedure set forth in ORS 33.720, the validation proceeding was joined by parties—the Attorney General and the Residents—who argued that the Ordinance was invalid because it was preempted by state and federal laws.[3] Additionally, pursuant to ORCP 33, a group of individuals and entities arguing that the Ordinance was not preempted intervened (Intervenors).

The trial court dismissed the Board's petition for want of justiciability. It concluded that no justiciable controversy existed in the case because the Board did not "seek to defend the ordinance from a challenge or resolve some conflict," but was seeking "what amounts to an advisory opinion designed to invalidate [its] own newly passed ordinance." The trial court further concluded that the "lack of controversy" was "not cured by the appearance of intervenors." As the trial court saw it, under ORS 33.710(4), the Board did "not have authority to seek, and the court [did]

---

[3] ORS 33.720 provides, in relevant part:

"(2) Jurisdiction of the municipal corporation shall be obtained by the publication of notice directed to the municipal corporation; and jurisdiction of the electors of the municipal corporation shall be obtained by publication of notice directed to all electors, freeholders, taxpayers and other interested persons, without naming such electors, freeholders, taxpayers and other interested persons individually. The notice shall be served on all parties in interest by publication thereof for at least once a week for three successive weeks in a newspaper of general circulation published in the county where the proceeding is pending, or if no such newspaper is published therein, then in a contiguous county. Jurisdiction shall be complete within 10 days after the date of completing publication of the notice as provided in this section.

"(3) Any person interested may at any time before the expiration of the 10 days appear and contest the validity of such proceeding, or of any of the acts or things therein enumerated. ***."

not have authority to grant, review of an ordinance without a justiciable controversy."[4]

On appeal, the Attorney General, the Board, and the Residents, contend that it was error for the trial court to dismiss the case for want of justiciability. Additionally, on appeal, the Attorney General and the Residents contend that we should reach the merits of the issue raised in the validation proceeding—*i.e.*, whether the Ordinance is unlawful because it is preempted by state and federal law. Intervenors, for their part, contend that the trial court did not err in dismissing the case for want of justiciability and that, even if it did, we should not reach the merits of the dispute.[5]

We conclude that the trial court erred when it dismissed the petition for want of justiciability. Additionally, we conclude that it is appropriate for us to reach the merits of the Board's petition. On the merits, we conclude that the Ordinance is preempted by ORS 166.170 and therefore void. Consequently, we reverse and remand.

## I.   BACKGROUND

### A.   *The Ordinance*

In 2018 and 2020, respectively, voters in Columbia County approved Initiative Measure 5-270, titled the "Second Amendment Preservation Ordinance" (SAPO), and Initiative Measure 5-278, titled the "Second Amendment Sanctuary Ordinance" (SASO). In March 2021, the Board combined the SAPO and the SASO into a single ordinance—the Ordinance—by, among other things, amending the

---

[4] ORS 33.710(4) provides:

"Nothing in this section allows a governing body to have a judicial examination and judgment of the court without a justiciable controversy."

[5] Intervenors also argue that the petition was not validly filed, and the trial court's judgment was not properly appealed, because the Board purportedly did not follow Oregon's public meetings laws, ORS 192.610 to 192.680. By the time Intervenors raised that argument, the time period for raising a challenge on that basis had expired, and Intervenors did not follow the appropriate procedure to do so. *See* ORS 192.680(5), (6) (providing 60 days to challenge a decision made in violation of the public meetings law and providing exclusive remedy). We also note that the argument that the petition was not validly filed because it was filed in violation of Oregon's public meetings laws was not raised below and is, thus, unpreserved.

SASO to include provisions from the SAPO. Columbia County Ordinance No. 2021-1.

As amended by the Ordinance, the SASO, which is incorporated into the Ordinance, is divided into six sections. The first section, "Findings," provides, in relevant part, that "all local, state, and federal acts, laws, orders, rules or regulations regarding firearms, firearms accessories, and ammunition are a violation of the Second Amendment."

Section 2, "Prohibitions," states:

"While within Columbia County, this Ordinance preserves the right of any person to keep and bear arms as originally understood; in self-defense and preservation, and in defense of one's community and country, and to freely manufacture, transfer, sell and buy firearms, firearm accessories and ammunition, which are designed primarily for the same purposes and protects ancillary rights that are closely related to the right to keep and bear arms protected by the Second Amendment; including the right to manufacture, transfer, buy and sell firearms, firearm accessories and ammunition[.]"

Section 2 also broadly prohibits agents, employees, and officials of Columbia County from "knowingly and willingly" participating "in any way in the enforcement of any Extraterritorial Act," which the fourth section, "Protections/Extraterritorial Acts," defines to include "all local, state and federal acts, laws, rules or regulations, originating from jurisdictions outside of Columbia County, which restrict or affect an individual person's general right to keep and bear arms, including firearms, firearm accessories or ammunition." Section 2 also prohibits agents, employees, and officials of Columbia County from "authoriz[ing] or appropriat[ing] governmental funds, resources, employees, agencies, contractors, buildings, detention centers or offices for the purpose of enforcing any element of such acts, laws, orders, mandates, rules or regulations, that infringe on the right by People to keep and bear arms."

Section 3, "Duty of Sheriff," provides that the Sheriff of Columbia County shall have the "duty" to "determine as a matter of internal policy and county concern per ORS 203.035, whether any federal, state or local regulation

affecting firearms, firearms accessories and ammunition, that is enforceable within his/her jurisdiction, violates the Second, Ninth, or Tenth Amendments to the Constitution of these United States, or Article 1, sections 27 and 33 of the Constitution of the State of Oregon, as articulated herein."[6]

Section 4, in addition to defining Extraterritorial Acts as noted above, declares that such Extraterritorial Acts "shall be treated as if they are null, void and of no effect in Columbia County, Oregon" and provides various exceptions.[7]

Section 5, "Enforcement of Violation," provides a maximum $2,000 fine for individuals and maximum $4,000 fine for corporations that violate the Ordinance.

Finally, Section 6, "Private Cause of Action," creates a private right of action against "any person" who "knowingly violates" the Ordinance while acting "under color of any state or federal law"; provides that such person "shall be liable to the injured party in an action at law, suit in equity, or other proper proceeding for redress"; and purports to strip "sovereign" and "governmental" immunity as affirmative defenses for agents and employees of Columbia County for cases brought against them under the Ordinance.

B.   *The Validation Proceeding*

The day after passing the Ordinance, the Board filed the petition in the Columbia County Circuit Court

---

[6] Section 3 of the Ordinance is discussed in Judge Egan's concurrence. 324 Or App at 245-47 (Egan, J., concurring).

[7] The exceptions in Section 4 provide:

"1) The protections provided Columbia County by Section 2 of this Ordinance do not apply to person[s] who have been convicted of felony crimes.

"2) This Ordinance is not intended to prohibit or effect in any way the prosecution of any crime for which the use, or possession of, a firearm is an aggravating factor or enhancement to an otherwise independent crime.

"3) This Ordinance does not permit or otherwise allow the possession of firearms in State or Federal buildings.

"4) This Ordinance does not prohibit individuals in Columbia County from voluntarily participating in permitting, licensing, registration or other processing of applications concealed handgun licenses or other firearm, firearm accessory, or ammunition licensing or registration processes that may be required by other legal jurisdictions outside Columbia County or by any other municipality inside Columbia County.

"5) Actions in compliance with a judgment or order of a District or Circuit court, based upon any Extraterritorial Act, are exempt from this Ordinance."

seeking a declaration as to the legality of the Ordinance under ORS 33.710. Specifically, the Board's petition sought a declaration as to whether the Ordinance is (1) preempted by Oregon's firearms law preemption statute, ORS 166.170, (2) "conflicts with or [is] incompatible with Federal firearms laws," and (3) "conflicts with or is incompatible with" various state firearms laws.

In accordance with the procedure set forth in ORS 33.720(2), the Board provided notice of the proceedings by publishing a "notice and summons" once a week for three successive weeks in a newspaper of general circulation in Columbia County. And, in accordance with the procedure set forth in ORS 33.720(3), the proceeding was joined by interested parties, the Attorney General and the Residents, who each opposed the Ordinance, taking the view that it was unlawful. Later, pursuant to ORCP 33, Intervenors—including Gun Owners of America, Inc., Gun Owners Foundation, Oregon Firearms Federation, and the chief petitioner of both the SASO and SAPO—moved to intervene, seeking to defend the Ordinance, so that the court would have "the benefit of having parties and legal representation on both sides of the various legal issues." The trial court granted that motion and set a briefing schedule.

The Attorney General, the Residents, and Intervenors, all briefed the issues of justiciability and preemption. After that briefing, the trial court dismissed the petition, concluding that there was no justiciable controversy, and, under ORS 33.710(4)—which provides that "[n]othing in this section allows a governing body to have a judicial examination and judgment of the court without a justiciable controversy"—the Board did "not have authority to seek, and the court does not have authority to grant, review of an ordinance without a justiciable controversy." In its letter opinion, the trial court reasoned that there was no justiciable controversy, because the Board did not "seek to defend the ordinance from a challenge or resolve some conflict," but, instead, sought "what amounts to an advisory opinion designed to invalidate [its] own newly passed ordinance." It further concluded that the "lack of controversy is not cured by the appearance of intervenors."

The trial court then entered a judgment dismissing the petition.

## C.   *The Present Appeal*

As noted, the Attorney General, the Residents, and the Board, all appeal the judgment dismissing the petition, arguing that the trial court erred in determining that there was no justiciable controversy. But, on appeal, they present differing views as to how we should analyze whether a validation proceeding is justiciable.

In the Attorney General's view, for a validation proceeding to be justiciable, ORS 33.710(4) requires the existence of a justiciable controversy that is "coextensive" with the "constitutional justiciability requirement recognized in Oregon case law." The Attorney General argues that that requirement was met here, because there was "an actual and substantial controversy between parties having adverse legal interests," and, therefore, the trial court erred. The Board, on the other hand, relying on *Couey v. Atkins*, 357 Or 460, 355 P3d 866 (2015), contends that there "are no justiciability limitations on the exercise of judicial power in public actions or cases involving matters of public interest," such as this one. As the Board sees it, the trial court had jurisdiction, because the Board followed the statutory procedure authorized by the legislature in ORS 33.710 and ORS 33.720, and ORS 33.710(4) did not impose any justiciability requirements beyond compliance with the statutory scheme itself. Finally, the Residents, for their part, contend that the justiciability requirement in ORS 33.710(4) "serves as a prohibition on validation proceedings for matters not listed in [ORS 33.710(2)], or for advisory opinions on matters for which the governing body does not intend to take action," and neither of those circumstances is present here.

Intervenors respond, among other points, that the Board's interpretation of ORS 33.710 reads the justiciability requirement out of ORS 33.710(4) rendering it surplusage, that ORS 33.710(4) prohibits advisory opinions, and that what the Board sought in this case amounts to an advisory opinion.

Additionally, the Attorney General and the Residents argue that, should we determine that this case is justiciable, we should reach the merits of the Board's petition and conclude that the Ordinance is preempted.[8] Intervenors argue that we should not reach the merits, but that if we do, we should conclude that the Ordinance is lawful. The Board takes no position on whether we should rule on the merits, nor does it take a position on the merits themselves.

## II.   ANALYSIS

### A.   *Justiciability*

The legally pertinent facts are undisputed, and the issue of justiciability is a question of law. *Thunderbird Mobile Club v. City of Wilsonville*, 234 Or App 457, 465, 228 P3d 650, *rev den*, 348 Or 524 (2010) (where facts were undisputed, reviewing justiciability determination for legal error); *SAIF v. Siegrist*, 297 Or App 284, 291-92, 441 P3d 655, *adh'd to as modified on recons*, 299 Or App 93, 455 P3d 47 (2019) ("By definition, statutes are law, and, as such, their interpretation always is a question of law.").

### 1.   *The Statutory Scheme Governing Validation Proceedings*

Prior to turning to justiciability under Oregon law, and whether this case is justiciable, we consider the statutory scheme governing validation proceedings, and what the legislature intended when enacting it with regard to justiciability. In that examination of legislative intent, we consider the text of the statute in its context, along with relevant legislative history, and, if necessary, relevant canons of statutory construction. *Doe v. Medford School Dist. 549C*, 232 Or App 38, 46, 221 P3d 787 (2009).

A "validation proceeding" is a special statutory proceeding created by the Legislative Assembly under ORS 33.710 and ORS 33.720, in which "certain local governmental entities can seek judicial examination of the legality of * * * some of the actions that they take." *State ex rel City of Powers v. Coos County Airport*, 201 Or App 222, 229, 119

---

[8] Additionally, Giffords Law Center to Prevent Gun Violence has filed an *amicus* brief arguing that we should reach the merits of the appeal. It argues that we should do so because, in its view, the Ordinance "frustrates life-saving Oregon gun laws," "chills law enforcement," and "misleads law-abiding residents."

P3d 225 (2005), *rev den*, 341 Or 197 (2006). As relevant here, ORS 33.710(2) authorizes a "governing body"—including the board of commissioners of a county—to

> "commence a proceeding in the circuit court of the county in which the municipal corporation or the greater part thereof is located, for the purpose of having a judicial examination and judgment of the court as to the regularity and legality of:

> "* * * * *

> "(e) Any decision of the governing body that raises novel or important legal issues that would be efficiently and effectively resolved by a proceeding before the decision becomes effective, when the decision will:

> "(A)  Require a significant expenditure of public funds;

> "(B)  Significantly affect the lives or businesses of a significant number of persons within the boundaries of the governing body; or

> "(C)  Indirectly impose a significant financial burden on the cost of conducting business within the boundaries of the governing body.

> "(f)  The authority of the governing body to enact any ordinance, resolution or regulation[; or]

> "(g)  Any ordinance, resolution or regulation enacted by the governing body, including the constitutionality of the ordinance, resolution or regulation."

The purpose of validation proceedings under ORS 33.710 is "to allow the governing body of the municipality to know if its proposed ordinance or course of action is lawful, before it * * * takes actions that will significantly affect citizens." Exhibit E, House Committee on Judiciary, HB 2581, Apr 2, 2003 (comments of Jim Torrey, Mayor of the City of Eugene, Oregon). Validation proceedings are "intended to promote efficiency of local governments and to prevent avoidable harms from controversies over the legality of an ordinance or other governmental action." *Id.*

While ORS 33.710 sets out the matters on which a "governing body" can commence a validation proceeding, ORS 33.720 sets forth procedures requiring notice to and

allowing intervention by interested parties. As relevant here, ORS 33.720 provides:

> "(2)   Jurisdiction of the municipal corporation shall be obtained by the publication of notice directed to the municipal corporation; and jurisdiction of the electors of the municipal corporation shall be obtained by publication of notice directed to all electors, freeholders, taxpayers and other interested persons, without naming such electors, freeholders, taxpayers and other interested persons individually. The notice shall be served on all parties in interest by publication thereof for at least once a week for three successive weeks in a newspaper of general circulation published in the county where the proceeding is pending, or if no such newspaper is published therein, then in a contiguous county. Jurisdiction shall be complete within 10 days after the date of completing publication of the notice as provided in this section.

> "(3)   Any person interested may at any time before the expiration of the 10 days appear and contest the validity of such proceeding, or of any of the acts or things therein enumerated. Such proceeding shall be tried forthwith and judgment rendered as expeditiously as possible declaring the matter so contested to be either valid or invalid."

In 2003, the legislature enacted House Bill (HB) 2581, which "enlarge[d] the scope of issues to which a governing body may seek to have a court determine the regularity, legality and constitutionality" under ORS 33.710. Staff Measure Summary, Senate Committee on Judiciary, HB 2581B, June 6, 2003; *see Brownstone Homes Condo. Assn. v. Brownstone Forest Hts.*, 358 Or 223, 236, 363 P3d 467 (2015) (legislative history includes staff measure summary). In addition to enlarging the scope of issues upon which a governing body could bring a validation proceeding, HB 2581 also added subsection (4) of ORS 33.710, which, as noted above, provides that nothing in ORS 33.710 "allows a governing body to have a judicial examination and judgment of the court without a justiciable controversy." Or Laws 2003, ch 548, § 1.

Regarding the addition of subsection (4) to ORS 33.710, Bill Joseph, Committee Counsel to the Senate Committee on Judiciary, explained that it "simply states

that the section being amended[, ORS 33.710,] does not by itself create a justiciable controversy where there is not one." Audio Recording, Senate Committee on Judiciary, HB 2581A, June 6, 2003, at 00:17:14 (Testimony of Bill Joseph, Committee Counsel); *see also* Staff Measure Summary, Senate Committee on Judiciary, HB 2581B, June 6, 2003 (amendment adding ORS 33.710(4) "[c]larifies that the measure does not create a justiciable controversy where one does not exist under the circumstances of the particular case at issue"). Joseph also described to the Senate Committee on Judiciary an example of when a validation proceeding would be justiciable consistent with the dictates of ORS 33.710(4):

> "Assume that a city decided to build a wastewater treatment facility and filed a petition with the court saying [we] want to make sure we have authority to do this. Somebody comes forward and they argue to the court no [the city does not] have authority to do this. There is now a justiciable controversy. There is a question of law in front of the court. There are two parties in this case."

Audio Recording, Testimony of Bill Joseph, Committee Counsel, HB 2581A, Senate Committee on Judiciary, HB 2581A, June 6, 2003, at 00:19:06 (Testimony of Bill Joseph, Committee Counsel).[9]

That view of what a justiciable controversy is in the context of a validation proceeding was shared by Representative Robert Ackerman, a cosponsor of HB 5281. Representative Ackerman explained to the House Committee on Judiciary what, in his view, was required for a validation proceeding to be justiciable:

> "In general terms, the municipality which seeks validation of its acts will file a claim in circuit court and provide notice by publication as set forth in ORS 33.720. * * *

> "In the event a defendant with proper standing makes an appearance in the case, the court will have a controversy upon which it can make a ruling."

---

[9] Joseph also observed that, in his view, in some circumstances, a case could be justiciable with only one party, such as a quiet title action. Audio Recording, Senate Committee on Judiciary, HB 2581A, June 6, 2003, at 00:17:40 (Testimony of Bill Joseph, Committee Counsel).

Testimony, House Committee on Judiciary, HB 2581, Apr 2, 2003, Ex D (statement of Rep Robert Ackerman). Thus, in Representative Ackerman's view, the provisions of ORS 33.720 "implement[]" the provisions of ORS 33.710. *Id.*

But in enacting HB 2581, Representative Ackerman and others were not of the view that every case in which a municipal corporation filed a petition under ORS 33.710 would result in a justiciable validation proceeding. For example, Representative Ackerman explained to legislators that a validation proceeding would be justiciable only where an interested party appeared challenging the governmental action as provided in ORS 33.720(3). *Id.* ("Since the courts require actual parties to appear in the proceeding and present a true controversy, the validation proceedings will not be effective unless a defendant with appropriate standing appears in the litigation."); *see also* Audio Recording, Senate Committee on Judiciary, May 21, 2003, HB 2581A, at 00:51:00 ("Yes, if nobody comes to the party, there's no party, okay, * * * and the [validation] process—in that case—would not be successful."). Similarly, in response to questions concerning the preclusive effect of validation proceedings, Staff Attorney for the Office of the Legislative Counsel, Hannah Mills, explained:

> "The way this currently is written it does not create a justiciable controversy. A municipality cannot go and just specifically ask for the legality of a regulation or an ordinance. For that to happen, there has to be an adverse party and the adverse party has to have a problem with the specific provision of the act and [if raising a constitutional concern] cite to a specific constitutional issue."

Audio Recording, House Committee on Judiciary, HB 2581, Apr 13, 2003, 00:03:25 (Comments of Hannah Mills).

2.   *Justiciability Under Oregon Law*

With that understanding of validation proceedings, we turn to justiciability under Oregon law.

Traditionally understood, justiciability includes a "constellation of related issues, including standing, ripeness, and mootness." *Yancy v. Shatzer*, 337 Or 345, 349, 97 P3d 1161 (2004), *abrogated on other grounds by Couey v. Atkins*,

357 Or 460, 355 P3d 866 (2015). It is a "vague standard," but it entails several definite considerations:

> "A controversy is justiciable, as opposed to abstract, where there is an actual and substantial controversy between parties having adverse legal interests. The controversy must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue. A justiciable controversy results in specific relief through a binding decree as opposed to an advisory opinion which is binding on no one."

*Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982) (internal citation omitted). Although it was not always consistent, the Supreme Court previously had held that, under the Oregon Constitution, the "judicial power does not include the authority to adjudicate cases in which there is no existing controversy." *Yancy*, 337 Or at 347; *see also Couey*, 357 Or at 510 (noting that, "over the course of the last 100 years, [Oregon] cases have veered back and forth between regarding justiciability as a constitutional imperative and treating it as a prudential consideration").

But in *Couey*, the Supreme Court clarified that "such justiciability doctrines as mootness and standing are not implicit in Article VII (Amended), section 1—at least not in public action cases or those involving matters of public importance." 357 Or at 521. Thus, in *Couey*, the court concluded that the legislature acted within its authority in enacting ORS 14.175—which allows review of cases that, although moot, are capable of repetition yet evading review— because the "the legislature's authority to enact legislation is plenary, subject only to limitations that arise either from the Oregon Constitution or from a source of supreme federal law," and neither of those sources of authority limited the legislature's authority to enact ORS 14.175 and authorize the courts to hear otherwise moot cases. *Id.* at 521 (internal quotation marks omitted).[10]

---

[10] We note that, in *Couey*, the court cautioned that, even in the absence of constitutionally prescribed justiciability considerations, "there remain other limitations on the 'judicial power' that may be exercised under the state constitution"— such as those dictated by separation of powers principles—and the "judicial power" is not an "empty vessel to be filled as it pleases the legislature." *Id.* at 520-21.

The legislature may also impose statutory justiciability requirements. *See Beck v. City of Portland*, 202 Or App 360, 363, 122 P3d 131 (2005) (noting that, "the legislature may impose statutory justiciability requirements," for example, "statutory standing requirements, as it has done in numerous statutes"). And where the legislature has imposed such requirements, the courts lack jurisdiction to consider a case where those requirements are not met. *Hill v. City of Portland*, 296 Or App 470, 479, 439 P3d 564 (2019) ("The circuit court properly dismissed the petition and quashed the writ for lack of jurisdiction, because a statutory justiciability requirement of ORS 34.040—that 'a substantial interest of [the] plaintiff has been injured'—was not met." (Quoting ORS 34.040; brackets in *Hill*.)).

3.  *The Validation Proceeding Is Justiciable*

Considering the statutory scheme governing validation proceedings and constitutional justiciability requirements under Oregon law as clarified in *Couey*, we conclude that the trial court erred in dismissing this case for want of justiciability. In our view, there is no constitutional justiciability barrier to the consideration of the validation proceeding in this case. Further, the statutory requirements for such a proceeding under ORS 33.710 (concerning the filing of a petition) and ORS 33.720 (concerning notice and intervention) were satisfied.

Here, as the legislative history regarding ORS 33.710 and ORS 33.720 makes clear, the process that the legislature intended for a validation proceeding to be justiciable under the statutory scheme was followed—namely, the Board filed its petition pursuant to ORS 33.710, notice was provided under ORS 33.720(2), and the Attorney General and the Residents joined as interested parties pursuant to ORS 33.720(3) raising a facial challenge to the Ordinance.

That series of events was reflective of the justiciable controversy in this case: there was an actual and substantial controversy concerning the legality of an ordinance that had been enacted by the County; the controversy involved present facts as opposed hypothetical future issues—*i.e.*, whether the Ordinance was preempted by state law; and a judicial proceeding would result in a binding decree as

to whether the Ordinance was void. We think that justiciable controversy would satisfy the justiciability requirements historically understood as arising under the Oregon Constitution.

In reaching our conclusion that the validation proceeding here is justiciable, we need not consider whether ORS 33.710(4) imposes justiciability requirements that operate independently of justiciability considerations under the Oregon Constitution; that is because under any plausible conception of what a "justiciable controversy" entails, as that term is used in ORS 33.710(4), those justiciability requirements are no more restrictive than the justiciable controversy requirements historically understood to be imposed by the Oregon Constitution, and, as noted above, we conclude those requirements are satisfied in this case. Nor do we need to decide whether a validation proceeding would be justiciable in the absence of the facts present in this case; that is, for example, in the absence of parties joining who have a stake in the outcome of a proceeding.

In reaching its conclusion that this case was not justiciable, the trial court noted its view that the board was not "seek[ing] to defend the ordinance from a challenge or resolve some conflict," but instead seeking "what amounts to an advisory opinion designed to invalidate [its] own newly passed ordinance," and reasoned that "lack of controversy is not cured by the appearance of intervenors." In our view, whatever the Board's motivation for filing the validation proceeding in accordance with ORS 33.710, the validation proceeding concerned the legality of extant law and was properly joined by parties who had a stake in the outcome—*i.e.*, residents of Columbia County itself and the Attorney General (*i.e.*, "the chief law officer for the state," ORS 180.210)—and who sought to challenge the legality of that law in accordance with ORS 33.720. Further, as noted, the validation proceeding would result in a binding decree. No justiciability barrier exists to reaching the merits of a validation proceeding in that circumstance.

Thus, we conclude that the trial court erred in dismissing the validation proceeding for want of justiciability; there was no constitutional justiciability barrier to

the consideration of the validation proceeding in this case and the statutory requirements for such a proceeding under ORS 33.710 and ORS 33.720 were met.

B. *The Ordinance is Preempted*

Having concluded that the trial court erred in dismissing the validation proceeding for want of justiciability, we also conclude that it is appropriate for us to reach the merits of the dispute and that the Ordinance is preempted by ORS 166.170 and is void.

As to whether we should reach the merits, we observe that this case presents a facial challenge to the legality of the Ordinance, which is a purely legal question, the merits of the case were fully briefed below, and there are no factual issues regarding the merits that prevent us from reaching them. *See Cascadia Wildlands v. Dept. of State Lands*, 293 Or App 127, 129, 427 P3d 1091 (2018), *aff'd*, 365 Or 750, 452 P3d 938 (2019) (after determining parties had standing, reaching merits although trial court did not, where the record was "fully developed—*viz.*, the merits of the parties' dispute were briefed and argued at an evidentiary hearing on the petition; the parties raise only issues of law on the merits on appeal; and" the standard of review meant that, "in practical effect," review was for legal error); *Farnsworth v. Meadowland Ranches, Inc.*, 321 Or App 814, 820, 519 P3d 153 (2022) ("[A] motion rests on purely legal contentions when the facts are not merely undisputed but immaterial, such as a facial challenge to the constitutionality of a statute." (Internal quotation marks omitted.)). We also note that the merits of this case would surely arise on remand if we do not address them. *Snyder v. Amsberry*, 306 Or App 439, 441, 474 P3d 417 (2020) (addressing legal issue "likely to arise on remand"). Consequently, in this case, we believe it appropriate to reach the merits of the parties' dispute over the legality of the Ordinance.

Whether "and the extent to which[] a state statute has preemptive effect is a question of legislative intent." *Doe*, 232 Or App at 46. We ascertain the intentions of the legislature by examining the text of the statute in its context, along with any relevant legislative history, and, if necessary, relevant canons of statutory construction. *Id.*

ORS 166.170 provides:

"(1)   Except as expressly authorized by state statute, the authority to regulate in any matter whatsoever the sale, acquisition, transfer, ownership, possession, storage, transportation or use of firearms or any element relating to firearms and components thereof, including ammunition, is vested solely in the Legislative Assembly.

"(2)   Except as expressly authorized by state statute, no county, city or other municipal corporation or district may enact civil or criminal ordinances, including but not limited to zoning ordinances, to regulate, restrict or prohibit the sale, acquisition, transfer, ownership, possession, storage, transportation or use of firearms or any element relating to firearms and components thereof, including ammunition. Ordinances that are contrary to this subsection are void."

We have interpreted "regulate," as used in ORS 166.170(1), to mean "'to govern or direct according to rule * * *; *usu:* to bring under the control of law or constituted authority: make regulations for or concerning <~the indus­tries of a country>.'" *Doe*, 232 Or App at 53 (quoting *Webster's Third New Int'l Dictionary* 1913 (unabridged ed 1993); omission and emphasis in *Webster's*). Further, we have explained that "matter," in ORS 166.170(1), "refers not to *the nature* of the regulation itself, but to *the subjects* to which the regulation applies." *Id.* at 55 n 4 (emphases added).

There is no doubt that, when enacting ORS 166.170, "the legislature intended to enact a broad preemption statute." *Id.* at 45. Its purpose was to avoid "a patchwork quilt of local government *laws* inconsistently regulating the use of firearms." *Id.* at 57-58 (emphasis in original). That is, the intent of the legislature in enacting ORS 166.170 was to ensure that firearms were regulated "in a uniform manner throughout the state." Tape Recording, House Committee on Judiciary, HB 2784, Apr 3, 1995, Tape 15, Side A (statement of Committee Chair Rep Del Parks).

As described above, the Ordinance in this case is quite broad. It finds that "all local, state, and federal acts, laws, orders, rules or regulations regarding firearms, firearms accessories, and ammunition are a violation of the Second Amendment"; declares that "[w]hile within Columbia

County," any person may "freely manufacture, transfer, sell and buy firearms, firearm accessories and ammunition"; declares, with limited exception, that all "local, state and federal acts, laws, rules or regulations, originating from jurisdictions outside of Columbia County, which restrict or affect an individual person's general right to keep and bear arms, including firearms, firearm accessories or ammunition" are to be treated "as if they are null, void and of no effect in Columbia County, Oregon"; prohibits employees and officials in Columbia County from participating "in any way in" enforcement of "all local, state and federal acts, laws, rules or regulations, originating from jurisdictions outside of Columbia County, which restrict or affect an individual person's general right to keep and bear arms, including firearms, firearm accessories or ammunition"; and creates a private right of action against "any person" who "knowingly violates" the Ordinance while acting "under color of any state or federal law."

We conclude that the Ordinance is preempted by ORS 166.170 and void. The Ordinance, with limited exception, purports to nullify all firearm regulations enacted by the Legislative Assembly. In doing so, it "bring[s] under the control of law" (*i.e.*, regulates) how firearms and firearms accessories (the subjects of the Ordinance) will be treated in Columbia County. If allowed to stand, it would, effectively, create a "patchwork quilt" of firearms laws in Oregon, where firearms regulations that applied in some counties would not apply in Columbia County, which is what ORS 166.170 was enacted to avoid. That is, it would create an uneven landscape of firearms laws throughout Oregon, with differences in regulation and enforcement throughout the state, and it would have the potential to lead to uncertainty for firearms owners concerning the legality of their conduct as they travel from county to county.

Because we conclude that the Ordinance is preempted by ORS 166.170, we do not consider whether it is also preempted because it cannot operate concurrently with various state or federal laws. *AT&T Communications v. City of Eugene*, 177 Or App 379, 395, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002) ("[L]ocal government authority may be preempted in either of two ways: It may be preempted

expressly, or it may be preempted implicitly, by virtue of the fact that it cannot operate concurrently with state or federal law."); *see also Mont. Shooting Sports Ass'n v. Holder*, 727 F3d 975, 978 (9th Cir 2013) (invalidating Montana statute providing that "'a firearm or ammunition manufactured * * * in Montana and that remains within the borders of Montana is not subject to federal law or federal regulation, including registration, under the authority of congress to regulate interstate commerce,'" because that statute conflicted with federal firearm licensing laws).[11]

---

[11] We highlight that both the state and federal governments have passed numerous enactments regulating firearms and firearm accessories. *See, e.g.*, ORS 166.645 (prohibiting hunting in cemeteries); ORS 166.663 (prohibiting casting artificial light from a motor vehicle while in the possession or immediate physical presence of a firearm); ORS 166.255(1)(b) (prohibiting possession of firearm or ammunition by any person convicted of qualifying misdemeanor where victim was a family or household member); ORS 166.272 (prohibiting possession a machine gun, short-barreled rifle, short-barreled shotgun, or firearms silencer); ORS 166.470(1)(a) (prohibiting sale, delivery, or transfer of firearms to person under 18 years of age); ORS 166.470(1)(e) (prohibiting sale, delivery, or transfer of firearms to person committed to the Oregon Health Authority under ORS 426.130); ORS 166.470(1)(g) (prohibiting sale, delivery, or transfer of firearms to person convicted of misdemeanor involving violence within previous four years); 26 USC §§ 5801-5872 (regulating and taxing certain activities relating to manufacture, sale, delivery, receipt, possession, and transport of firearms); 19 USC § 922(a)(1)(A) (prohibiting persons, other than licensed importers, manufacturers, or dealers, from engaging in business of importing, manufacturing, or dealing in firearms in interstate or foreign commerce); 19 USC § 922(a)(1)(B) (prohibiting persons, other than licensed importers, manufacturers, or dealers, from engaging in business of importing or manufacturing ammunition in interstate or foreign commerce); 19 USC § 922(a)(3) (prohibiting persons, other than licensed importers, manufacturers, or dealers, from receiving in the state where such person resides a firearm purchased or otherwise obtained from outside that state); 19 USC § 922(a)(6) (prohibiting certain use of false or fictitious oral or written statements or false, fictitious, or misrepresented identification in connection with acquisition or attempted acquisition of a firearm or ammunition); 19 USC § 922(a)(7), (8) (prohibiting manufacture, import, sale, or delivery of armor-piercing ammunition, unless otherwise authorized by law); 19 USC § 922(b)(1) (prohibiting licensee's sale or delivery of any shotgun or rifle to individual known or reasonably believed to be under 18 years of age); 19 USC § 922(d)(2), (g)(2) (prohibiting firearm sales to or possession by a fugitive from justice); 19 USC § 922(d)(3), (g)(3) (prohibiting firearm sales to or possession by any person who is an unlawful user of or addicted to any controlled substance, as defined in 21 USC § 802); 19 USC § 922(d)(6), (g)(6) (prohibiting firearm sales to or possession by any person discharged from the Armed Forces under dishonorable conditions); 19 USC § 922(d)(7), (g)(7) (prohibiting firearm sales to or possession by any person who, having been a citizen of the United States, has renounced his citizenship); 19 USC § 922(d)(9), (g)(9) (prohibiting firearm sales to or possession by any person convicted of a misdemeanor crime of domestic violence); 19 USC § 922(p)(1) (prohibiting transfer or possession firearms not detectable by walk-through metal detectors).

### III.   CONCLUSION

We conclude that the Board's petition is justiciable, and we exercise our discretion to reach the merits of the petition. Having considered the merits of the Board's petition, we conclude that the Ordinance is preempted by ORS 166.170 and void.[12] We reverse the judgment of dismissal and remand for further proceedings consistent with this opinion.

Reversed and remanded.

**EGAN, J.,** concurring.

I fully agree with and endorse the majority's disposition and reasoning in this case. I write separately to draw attention to the disturbing implications at the heart of Intervenor's arguments and the Ordinance itself because, as George Orwell wrote in 1946, "if thought corrupts language, language can also corrupt thought. A bad usage can spread by tradition and imitation even among people who should and do know better."

During the course of argument, Intervenor's counsel referred to alleged United Nations (UN) and "international firearms laws." Those references allude to the conspiracy theory that the UN has or will impose *mandates* upon the federal government that will require state and local governments to do the bidding of the UN, specifically to disarm the American public in violation of the Second Amendment to the United States Constitution and Article I, section 27, of the Oregon Constitution. In other words, Intervenors came before this court and referenced *UN mandates*, which, as explained below, is a well-documented trope meant to invoke white supremacist, antisemitic fear of a takeover of our country by outsiders and minorities who are manipulated by an elite class of supervillains.

---

Although we need not reach any legal conclusion on the matter, we do not understand how the Ordinance, its private cause of action for those that violate the Ordinance while acting under color of any state or federal law, and its imposition of penalties for violation of the Ordinance, could operate concurrently with all such laws.

[12] In their briefing on appeal, Intervenors did not meaningfully address the issue of severability. Given ORS 166.170, and the subject matter of the Ordinance, we conclude that the Ordinance is preempted in its entirety.

One purported "solution" to this entirely fictitious problem—a solution which has been advocated for by a group called the Constitutional Sheriffs and Peace Officers Association (CSPOA)—is for county sheriffs to be given the power to determine which firearms laws are constitutional. In keeping with that "solution," Section 3 of the Ordinance provides:

> "It shall be the duty of the Sheriff of Columbia County to determine *** whether any federal, state or local regulation affecting firearms, firearms accessories and ammunition, that is enforceable within his/her jurisdiction, violates the Second, Ninth, or Tenth Amendments to the Constitution of these United States, or Article 1, sections 27 and 33 of the Constitution of the State of Oregon, as articulated herein."

As explained below, both counsel's argument concerning *UN mandates* and the Ordinance's solution have their origins in the ideology of white supremacist nationalism which runs contrary to the tenets of our constitutional republic.

### *The Purpose of this Concurrence*

As noted, I agree with the majority's disposition and reasoning in this case; the majority opinion grapples with justiciability and preemption in a manner appropriate for an appellate court.

On occasion, however, individual members of the court must call out illegitimate *quasi-legal* arguments and theories for what they are—*viz.*, antisemitic and racist tropes. Otherwise, those *quasi-legal* arguments and theories gain an air of legal legitimacy from which future litigants may seek to advance unconstitutional causes. The duty of a judge to call out such *quasi-legal* arguments and theories for what they are is particularly acute when counsel for a party comes before this court and asks us to adopt such a trope in upholding a facially invalid ordinance.

I must be clear that the flawed *quasi-legal* argument offered by Intervenors—*viz.*, the UN wants to disarm Americans—and the proposed solution—*viz.*, imposing a duty on county sheriffs to determine which laws are

constitutional—have their origins in the insidious effort to oppress, in violation of fundamental notions of due process and equal protection under the rule of law.[1] And in doing so, the Ordinance undermines, not elevates, the rights guaranteed by the United States Constitution.

### *The Ordinance is Contrary to the Tenets of Our Constitutional Republic*

As noted, the plain language of Section 3 of the Ordinance mandates that a *singular* county sheriff have the duty to determine the constitutionality of any state or federal law concerning firearms. According to the Intervenors, that provision would prevent the imposition of *UN mandates* in Columbia County, Oregon.

Section 3 of the Ordinance raises the question: What is the role of sheriffs and what is the role of courts under our system of government? That question brings to bear just one of the many foundational problems with the Ordinance: Deciding whether a law is unenforceable because it is unconstitutional is not the function of a county sheriff. *See* ORS 206.010 (setting forth the duties of Oregon sheriffs). Instead, under our system of government, it is unquestionably the province and duty of the courts. US Const, Art III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); Or Const, Art VII (Amended), § 1 ("The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."); *see also Marbury v. Madison*, 5 US 137, 177, 2 L Ed 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

There is no dispute that courts, not sheriffs, decide whether a law violates the First Amendment to the United States Constitution or Article I, section 8, of the Oregon

---

[1] This journalistic function of a concurrence was best characterized by Judge James in *State v. Bledsoe*, 311 Or App 183, 197, 487 P3d 862, *rev den*, 368 Or 637 (2021) (James, J., concurring):

"Judicial opinions serve many functions, and one of those is journalistic. Our opinions are dispatches from the edge—moments, recounted for posterity, of how Oregon's laws *** and the lives of its citizens, intersect."

Constitution; no dispute that courts, not sheriffs, decide whether, for example, a county policy concerning search and seizure runs afoul of the Fourth Amendment to the United States Constitution or Article I, section 9, of the Oregon Constitution; and no dispute that courts, not sheriffs, decide when governmental conduct has violated the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Similarly, there can be no dispute that courts, not sheriffs, decide when a "federal, state or local regulation affecting firearms, firearms accessories and ammunition," violates the Second Amendment to the United States Constitution or Article I, sections 27 and 33 of the Oregon Constitution.

Those observations about the roles of courts and sheriffs in our system of government in no way denigrate the courageous work of those who serve as sheriffs and deputy sheriffs in Oregon. It is sheriffs and deputy sheriffs, *not judges*, who perform the often-dangerous task of enforcing criminal laws, solving crimes, and protecting our courtrooms. That work is essential to ensuring our communities are safe for Oregonians and democracy. And that system of checks and balances—that division of labor—is an essential and an enduring feature of our republic, which is violated by Section 3 of the Ordinance.

The Ordinance raises another question: Can laws enacted by a county supersede those enacted by the legislative branches of the state and federal governments? The answer to that question is also no.

Pursuant to the Supremacy Clause of the United States Constitution, Columbia County, Oregon, cannot enact an Ordinance that contravenes federal law. *AT&T Communications v. City of Eugene*, 177 Or App 379, 401, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002) ("The Supremacy Clause of the United States Constitution, Article VI, clause 2, invalidates state or local laws interfering with, and being contrary to, federal law." (Internal quotation marks omitted.)); *see also Altria Group, Inc. v. Good*, 555 US 70, 76, 129 S Ct 538, 172 L Ed 2d 398 (2008) (explaining that state laws that conflict with federal laws are "without effect"). Nor can Columbia County, Oregon, enact an Ordinance that

contravenes Oregon law. *La Grande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *aff'd on reh'g*, 284 Or 173, 586 P2d 765 (1978) ("[T]he validity of local action depends \*\*\* on whether it contravenes state or federal law."). Yet, the Ordinance does just that by declaring federal and state enactments are to be treated as if they are "null, void and of no effect in Columbia County, Oregon" and giving the sheriff of Columbia County, rather than the courts, final say concerning the constitutionality of enactments concerning firearms.

Put plainly, the Ordinance is repugnant to the separation of powers under the United States Constitution and the Oregon Constitution, and is repugnant to the framers' constitutional design. It debases—not protects—the rights guaranteed thereunder.

*The Antisemitic and Racist Origins of the Ordinance*

The conclusion that the Ordinance is patently violative of the state and federal constitutions raises another question—what is the motive behind the Ordinance?

The sponsors of Initiative Measure 5-270 and Initiative Measure 5-278, which became the Ordinance, failed to offer up a substantive statement in support of, or an explanation for, their proposals that would have explained their purpose in sponsoring those measures.[2] But in recent years, "Second Amendment Sanctuary Ordinances" have been proposed around the United States and adopted in hundreds

---

[2] *See Official Columbia County Voters' Pamphlet, General Election*, Nov 6, 2018 (no statement in support of the proposed ordinance); *Official Columbia County Voters' Pamphlet, General Election*, Nov 3, 2020.

In the 2020 Voters' Pamphlet, the only statement in support of Initiative Measure 5-278 came from Oregon Firearms Federation OFF. In its hyperbolic rhetoric, OFF stated:

"Even as Portland politics continues to condone chaos on our streets, efforts continue to make sure you are helpless to protect yourself and your family. \*\*\* Year after year, politicians in Salem and extremists in Portland work overtime to enact new laws and rules to restrict your 2nd Amendment rights or make self-defense firearms useless, if available at all. \*\*\* [T]he same people who are looting and destroying property are demanding that police be neutered."

This statement offered no meaningful explanation of Initiative Measure 5-278.

of counties[3] as part of a nationwide effort promoted by the CSPOA.[4] Such ordinances have notably consistent language.[5]

CSPOA claims to eschew racist ideology, but in fact its leaders embrace racist and white nationalist ideologies. The growing "constitutional sheriffs" movement intends to increase the risk of conflict between local law enforcement and federal authorities. The movement is animated by the *deeply flawed* and ahistorical view that county sheriffs hold ultimate law-enforcement authority in each individual county outranking federal and state authority. This *deeply flawed* and legally incorrect analysis holds that the superiority of county authority is deeply rooted in Anglo-American law. The anti-democratic ideas and *quasi-legal theories* propounded by the CSPOA and embedded in Second Amendment Sanctuary Ordinances have their origins in the writings of William Potter Gale, who founded the *posse comitatus* movement in the 1960s. They also have their origins in the writings of the Aryan Nation, an antisemitic, white supremist group.

The premise of such writings is the antisemitic and racist conspiracy theory that Jews are at the heart of America's problems, that people of color are unwitting pawns to be manipulated by one side or the other, and that zealots must prepare for a final battle in the last days. The proponents of these ideas claim that a cabal of elites or globalists (code words for Jews) in the UN, or the fictional New World Order or Zionist Occupational Government, manipulate our federal government and, by extension, state governments.

---

[3] A conservative estimate of the number of Second Amendment Sanctuary Ordinances and Resolutions adopted by local governments in the United States is 860. And by some estimates, approximately 1,900 counties are covered by Second Amendment sanctuary legislation because of legislation passed at either the state or county level.

[4] *See Statement of Positions: The Right to Keep and Bear Arms (RTKBA) The Second Amendment,* CSPOA, https://cspoa.org/sop/ (accessed Jan 5, 2023); *Resolution of the Constitutional Sheriffs and Peace Officers Association,* Jan 24, 2014, CSPOA, https://cspoa.org/wp-content/uploads/cspoa-resolution-Final-20140128.pdf (accessed Jan 5, 2023).

[5] *See* footnote 3. With over 860 Second Amendment Sanctuary Ordinances and Resolutions from all over the United States, every section of the Ordinance is simply a reflection of the multitude of sections and subsections of other ordinances or resolutions in effect somewhere around the country.

These ideas are, of course, nothing new, unique, or intelligent: They are, instead, just a rehashing of the ancient trope of a secret Jewish government; they are the retelling of a lie that led to the murder of over six million Jews within living memory.

That same racist and antisemitic dogma was reflected in the language of militiamen who carried assault rifles as counterforces to political protest while African Americans in Ferguson, Missouri, were arrested for mere suspicion of carrying guns; reflected the treatment of white people with guns as contrasted against the disparate state sanctioned killing of minorities with guns; and used by the Oath Keepers and Proud Boys to attempt to create a false narrative of badge verses badge conflicts at the Oregon State Capitol on December 21, 2020, and again at the United States Capitol on January 6, 2021. The dogma can also be identified by the shape of the language and arguments used to support Second Amendment Sanctuary Ordinances that claim to protect an *absolute right* to guns, and the authority of county sheriffs to enforce that *absolute right*.

Intervenor's reference at oral argument about *UN mandates* in support of an *absolute right* to firearms threatens to give legal foundation to a world view that embraces religious, racial, and ethnic hatred.[6] The arguments propounding *unfettered access* to guns, ammunitions, and implements of destruction give rise to waging of war on government because the proponents believe that our government is infected by those they hate. This hate is unquestionably embedded in the trope that the *UN* or some other nefarious entity is manipulating government behind the scenes and that the courts are simply tools of those manipulations. As a judge, sworn to uphold the Oregon Constitution and the United States Constitution, I cannot stand by without identifying the origins of that argument, and the origins of the Ordinance.

The history of white supremacist ideology in this country is older than the United States Constitution; it

---

[6] Attorneys, particularly during legal argument, must be cautious with their language. As Desmond Tutu observed, "Language is very powerful. Language does not just describe reality. Language creates the reality it describes."

dates to the moment enslaved Africans were brought ashore in North America in 1619. The long arc of American democracy has mitigated some of its largest evils by ending chattel slavery, granting women's suffrage, ending *de jure* racial and gender discrimination, and more recently ending prohibitions against same-sex marriage and supporting efforts to eradicate discrimination against LGBTQ+ individuals. However, as Mr. Orwell reminded us nearly 80 years ago, "[o]ne cannot change this all in a moment, but one can at least change one's own habits, and from time to time one can even, if one jeers loudly enough, send some worn-out and useless phrase—some \*\*\* lump of verbal refuse—into the dustbin, where it belongs."

Thus, to the dustbin goes the argument of *UN mandates* and *constitutional sheriffs*.